908 F.2d 728
 30 Fed. R. Evid. Serv. 1197
 UNITED STATES of America, Plaintiff-Appellee,
v.
Albert HARRIS, a/k/a Bert, Lloyd Frink, Steven Bucchiere,
Philip Cardilli, a/k/a Shaver, Jesus Haim, a/k/a
Waterbucket, Alp Martin, Defendants-Appellants.
 No. 88-6212.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 8, 1990.
 
 Marcia J. Silvers, Miami, Fla., for Harris.
 Robert P. Foley, Foley and Colton, P.A., West Palm Beach, Fla., for Frink.
 Leonard J. Cooperman, Miami, Fla., for Bucchiere.
 S. Skip Taylor, Miami, Fla., Nathan Z. Dershowitz, Dershowitz & Eiger, P.C., New York City, for Cardilli.
 Hilliard Moldof, Whitelock & Moldof, Ft. Lauderdale, Fla., for Haim.
 Lori Barrist, Asst. Federal Public Defender, Miami, Fla., for Martin.
 Michael E. Runowicz, Linda Collins Hertz, Lynne W. Lamprecht, Anne Ruth Schultz, Asst. U.S. Attys., Miami, Fla., for the U.S.
 Appeal from the United States District Court for the Southern District of Florida.
 Before HATCHETT and ANDERSON, Circuit Judges, and DYER, Senior Circuit Judge.
 HATCHETT, Circuit Judge.
 
 
 1
 In this multiple count and multiple defendant drug importation case, we reverse the convictions on one appellant, but affirm on at least one count on the other appellants.
 
 FACTS
 
 2
 In 1982, Philip Cardilli, along with co-conspirators James Coley, Michael Munday, Daniel Sims, Richard Bahmann, and Frank Bahmann, devised a plan to import cocaine into the United States. The conspiracy, known as the "Munday/Coley organization," between 1983 and 1986, successfully completed many importations of cocaine and marijuana. The plan called for Coley and Munday to fly a Piper Navajo to Stella Maris, in the Bahamas. Coley and Munday would dress in uniforms to resemble charter pilots and bring women including Joyce Coley, Lisa Cardilli, and Nancy Sims, to stay on the island as if on vacation to give a legitimate appearance to the trip. Coley and Munday then would fly the aircraft to Colombia and obtain a load of cocaine. Upon returning to the Bahamas, they usually dropped the drugs into the waters of Scrub Cay where Cardilli stowed them aboard small boats. A second plane, a scout, accompanied the boats either to Nassau or to the United States to detect law enforcement activities. Munday and Coley would then return to Stella Maris in the Navajo and fly the women back to the United States. The government presented evidence of at least nine successful importations of approximately 400 kilograms of cocaine per trip under this plan.
 
 
 3
 In August, 1983, some members of the conspiracy assisted an unidentified man known as "Uncle Bill" in off-loading marijuana from a freighter in the Bahamas. Frank Bahmann flew a plane over the area to search for the freighter while Cardilli assisted in retrieving the bales of marijuana which were thrown out of the freighter. On the evening of the day when the drugs were off-loaded, Frank Bahmann saw Cardilli, Daniel Sims, Bill Cossin, a man named Vince, and Bucchiere enter the restaurant where Bahmann was having dinner with Nancy Sims. Bahmann testified that Cardilli, Sims, Cossin, Vince and Bucchiere were all "dirty, scratched up," and "disheveled." Danny Sims told Bahmann that they had unloaded the freighter and put the marijuana on an island. It took Cardilli three separate trips to bring the entire load to the United States.
 
 
 4
 In 1985, the conspiracy devised a new scheme which bypassed the Bahamas. Under the new scheme, drugs were flown directly to "the ranch," located near Lakeland, Florida. In Lakeland, the conspiracy employed several people, including Martin, to act as "lookouts," to warn co-conspirators not to land the plane if law enforcement personnel were nearby. The conspiracy's activities ended in September of 1986 when law enforcement agents intercepted a plane after it landed at the Lakeland ranch.
 
 PROCEDURAL HISTORY
 
 5
 A grand jury returned a twenty-eight count indictment against thirty co-defendants associated with the conspiracy. The counts included continuing criminal enterprise, 21 U.S.C. Sec. 848, violation of the Travel Act, 18 U.S.C. Sec. 371, conspiracy to import controlled substances, in violation of 21 U.S.C. Sec. 963, and a variety of counts for the importation of cocaine and the importation of marijuana, in violation of 21 U.S.C. Sec. 952(a). Eighteen defendants entered guilty pleas; six remained at large at the time of the appellants' trial; only the six appellants went to trial.
 
 HARRIS
 
 6
 The jury convicted Harris of conspiracy to violate the Travel Act, conspiracy to import controlled substances, and two counts of importing cocaine, but acquitted Harris on one count of importing cocaine and one count of importing marijuana.
 
 FRINK
 
 7
 The jury convicted Frink of conspiracy to import controlled substances and one count of importing cocaine, but acquitted Frink of conspiracy to violate the Travel Act.
 
 BUCCHIERE
 
 8
 The district court granted Bucchiere's motion for judgment of acquittal on one count of importing cocaine. The jury convicted Bucchiere on one count of importing marijuana, and acquitted him on three other counts of importing marijuana.
 
 CARDILLI
 
 9
 The jury convicted Cardilli of operating a continuing criminal enterprise, conspiracy to violate the Travel Act, conspiracy to import controlled substances, three counts of importing cocaine, and three counts of importing marijuana. The jury acquitted Cardilli on one count of importing marijuana.
 
 HAIM
 
 10
 The jury convicted Haim of operating a continuing criminal enterprise, conspiracy to violate the Travel Act, and three counts of importing cocaine.
 
 MARTIN
 
 11
 The district court granted Martin's motion for a judgment of acquittal on two counts of importing cocaine. The jury convicted Martin of continuing criminal enterprise, conspiracy to violate the Travel Act, and three counts of importing cocaine, but acquitted him of two other counts of importing cocaine.
 
 JURY MATTERS
 
 12
 On the second day of trial, the court took testimony that during a lunch break, one juror was overheard telling another juror that "these guys sitting across from us think they're going to get off on this." The defense asked that the two jurors be examined and also moved that either the two jurors be excused or that a mistrial be granted. The court denied the motion and without repeating the comment, asked the jury as a group whether "any juror has made any kind of decision up to this point that he or she could not keep a completely open mind until all of the evidence is in, and until the case has been explained to you." No juror responded affirmatively and the trial continued.
 
 
 13
 One of the same jurors later was heard to say from the jury box "do it to him good" as a Drug Enforcement Agency agent was about to testify. The defense again moved that the juror be excused or that the court grant a mistrial. The district court denied the motion.
 
 CONTENTIONS OF THE PARTIES
 
 14
 All appellants contend that the district court failed to adequately investigate the alleged incidents of juror misconduct, and that the evidence is insufficient to prove their guilt beyond a reasonable doubt. Martin contends that the district court erred in denying his motion for severance. Bucchiere and Harris contend that the district court erred in admitting the declarations of co-conspirators.
 
 
 15
 Cardilli raises the following contentions: (1) the district court improperly instructed the jury on the continuing criminal enterprise charge; (2) the district court erred in excluding impeachment testimony; (3) the district court improperly answered a jury question regarding Federal Bureau of Investigation reports; (4) the district court erred in denying his motion for a Byrd severance; (5) the district court improperly allowed the trial to proceed during his absence; and (6) the district court improperly ordered separate convictions and sentences for the conspiracy and continuing criminal enterprise counts.
 
 ISSUES
 
 16
 The issues presented are: (1) whether the district court abused its discretion in investigating the alleged incidents of juror misconduct; (2) whether sufficient evidence supports the convictions; (3) whether the district court erred in denying Martin's motion for severance; (4) whether the district court erred in admitting declarations of co-conspirators; (5) whether the district court properly instructed the jury on the continuing criminal enterprise charge; (6) whether the district court erred in excluding impeachment testimony; (7) whether the district court properly answered the jury's question regarding FBI reports; and (8) whether the district court erred in denying Cardilli's motion for a Byrd severance.
 
 DISCUSSION
 I. Juror Misconduct
 
 17
 The district court has broad discretion in choosing the investigative procedure to be used in checking for juror misconduct and only abuse of that discretion will constitute error. United States v. Caldwell, 776 F.2d 989, 997 (11th Cir.1985). Juror misconduct concerning outside influences must be fully investigated to determine if any misconduct actually occurred and whether or not it was prejudicial. United States v. Brantley, 733 F.2d 1429, 1439 (11th Cir.1984), cert. denied, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985). Failure to hold a hearing in these cases constitutes an abuse of discretion and is thus reversible error. United States v. Chiantese, 582 F.2d 974, 979 (5th Cir.1978), cert. denied, 441 U.S. 922, 99 S.Ct. 2030, 60 L.Ed.2d 395 (1979).[1]
 
 
 18
 When, however, the alleged juror misconduct is based on statements jurors made which were not caused by media publicity or other outside influences, the court may use its discretion in deciding whether to interrogate the jurors. Grooms v. Wainwright, 610 F.2d 344, 347-48 (5th Cir.), cert. denied, 445 U.S. 953, 100 S.Ct. 1605, 63 L.Ed.2d 789 (1980). In United States v. Caldwell, 776 F.2d 989, 998 (11th Cir.1985), the court found that "[t]he more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate." On the other hand, "[t]he more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate." Caldwell, 776 at 998.
 
 A. The First Remark
 
 19
 This case requires us to examine two alleged incidents of juror misconduct. The meaning of the first remark--"these guys sitting across from us think they're going to get off on this"--is ambiguous. Although the district court believed that a literal reading of the comment might not indicate prejudice, the district court stated that "the most logical interpretation of it" was that it conveyed "some conclusion adverse to the defendants."
 
 
 20
 We believe that this general ambiguous observation by one juror of the appellants' demeanor does not suggest serious jury contamination. Furthermore, the district court's limited hearing on the matter was appropriate because additional investigation might have over-emphasized the remark. See Chiantese, 582 F.2d at 980 ("the court must balance the probable harm resulting from the emphasis such action would place upon the misconduct and the disruption involved in conducting a hearing against the likely extent and gravity of the prejudice generated by that misconduct."). In deciding not to interview the jurors, the district court found that "examination of the two jurors would only aggravate the situation, and after we talk to them about it, I think we wouldn't have any alternative but to excuse them, or declare [a] mistrial." The district court cured any possible taint by questioning the jurors on their ability to remain impartial and giving them an admonition to keep an open mind. No juror indicated an inability to remain impartial. We hold, therefore, that the district court did not abuse its discretion in refusing to further investigate the first alleged remark indicating juror misconduct.
 
 B. The Second Remark
 
 21
 One juror allegedly made the second remark while in the jury box. Although the government argues that the statement--"do it to him good"--was never made, in the absence of a hearing by the district court, we must assume that it was made. See Chiantese, 582 F.2d at 980. The district court refused to investigate this remark because it observed that after several weeks of trial the jurors would naturally begin to form an opinion of the case. In Grooms v. Wainwright, the court found no abuse of discretion in the trial court's denial of a motion for a new trial where a juror remarked that "as far as I'm concerned, [from] what I heard already he's guilty." The court reasoned that the comment, made at the end of the prosecution's case, did not reflect serious prejudice, "but only an objective evaluation of the evidence presented to date in the trial." Grooms, 610 F.2d at 348.
 
 
 22
 We also consider the meaning of this second statement to be ambiguous. Although defense counsel contends that the juror who made the statement was looking at the DEA agent when he spoke those words, nothing suggests the identity of "him". Because the trial court is better able to judge the mood at trial and the predilections of the jury, we defer to the district court's conclusion that this statement did not reflect serious juror contamination. The district court properly exercised its discretion in deciding that the remark, made in the third week of trial, did not justify a potentially disruptive investigation.
 
 II. Sufficiency of the Evidence
 
 23
 To determine whether sufficient evidence supports the convictions, we review the evidence in the light most favorable to the government and consider whether it proves the appellants' guilt beyond a reasonable doubt. The evidence need not be wholly inconsistent with every reasonable hypothesis except that of guilt. United States v. Sanchez, 722 F.2d 1501, 1505 (11th Cir.1984), cert. denied, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984).
 
 A. Harris
 
 24
 Harris argues that his conviction must be reversed because he presented alibi testimony concerning delivery of drugs to the Lakeland ranch in June 1986. The evidence shows however, that Harris had meetings and discussions with Coley about flying as a co-pilot on flights to Colombia and that he actually flew as co-pilot on two occasions. Even if a defendant presents alibi testimony, the jury is free to disbelieve the evidence and reject the defense. United States v. Cotton, 770 F.2d 940, 945 (11th Cir.1985). We hold that ample evidence supports Harris's convictions of conspiracy and importation of cocaine and marijuana.
 
 B. Frink
 
 25
 Frink contends that he could not be convicted on the testimony of four co-conspirators, particularly when two of them were unable to identify him. One co-conspirator, Coley, testified to meeting with Frink in November 1983 to discuss flying the scout plane. Bahmann, another co-conspirator, testified that he spoke with Frink while Frink was flying the scout plane. The jury had the right to credit this testimony. Consequently, we hold that sufficient evidence supports Frink's convictions for conspiracy and importation of cocaine.
 
 C. Bucchiere
 
 26
 Bucchiere contends that the government did not present direct or circumstantial evidence to demonstrate that he participated in the drug conspiracy. Frank Bahmann testified that he saw Bucchiere with Cardilli and three others in a bar in Nassau, Bahamas. At that time, Daniel Sims told Bahmann that "they" had unloaded some marijuana, but did not identify who he referred to as "they". The evidence did not show that Bucchiere heard Sims's remarks or assented to them.
 
 
 27
 In the light most favorable to the government, Bahmann's testimony placed Bucchiere in the presence of members of the conspiracy, but it did not connect him to activities or physical acts necessary to support a conviction for importation of marijuana. See United States v. Sarro, 742 F.2d 1286, 1298 (11th Cir.1984) (close association with conspirators is insufficient evidence of knowing participation in the crime). The prosecutor asked Bahmann whether he had seen Bucchiere on the subsequent trips to transfer the marijuana to the United States. Bahmann responded "yes, he was there to the best of my recollection." The testimony does not identify whether "there" referred to the bar where Bahmann had seen him in the presence of Daniel Sims or whether it referred to the boats transporting the marijuana to the United States. Because the testimony failed to adequately identify any activities by Bucchiere with the actual importation of marijuana, we hold that the evidence is insufficient to prove his guilt beyond a reasonable doubt.
 
 D. Cardilli
 
 28
 Cardilli contends that the government failed to prove that he managed at least five co-conspirators as required under the continuing criminal enterprise charge, 21 U.S.C. Sec. 848(c)(2)(A). The government had to prove that five or more persons, identified prior to trial, acted in concert with Cardilli in his alleged "boat operation" and that he organized, supervised, or managed them. To prove that Cardilli engaged in a continuing criminal enterprise, the government had to prove that (1) Cardilli committed a felony violation of the Federal laws, (2) which was part of a continuing series of such violations, (3) which were undertaken in concert with five or more persons, (4) with respect to whom Cardilli occupied a position of organizer or supervisor or any other position of management, and (5) from which he derived substantial income or resources. United States v. Boldin, 818 F.2d 771, 774 (11th Cir.1987). Cardilli challenges the third and fourth elements necessary to prove the offense, arguing that the government only proved that he conspired with and managed three other boat crewmen.
 
 
 29
 The government presented extensive evidence on Cardilli's key role in organizing and coordinating the pickup and transportation of drugs by boat. Cardilli concedes that the evidence demonstrated that Daniel Sims, William Cossin, and Vince were boat crewmen. Cardilli argues that Nancy Sims may have been only an innocent bystander and the fact that she pleaded guilty to conspiring with Cardilli and all the others to travel in interstate and foreign commerce to import drugs does not prove Cardilli managed her. We agree, but we further note that by his admission on February 2, 1985, in a videotaped conversation, Cardilli stated that he had reduced his crew down to a fifth of what it had been. If the jury believed this evidence, as it had a right to do, five or more persons were managed by Cardilli. Therefore, sufficient evidence supports Cardilli's conviction for continuing criminal enterprise, and we so hold.
 
 E. Haim
 
 30
 Haim contends that the evidence is insufficient to support his convictions on one count of importing cocaine and one count of importing marijuana. In support of this contention, Haim points to the alibi testimony he presented, confusion in the testimony concerning the dates charged in the indictment, and the questionable nature of Joyce Coley's identification. Fellow conspirators testified, however, that on three occasions in 1984, Haim retrieved cocaine dropped from the Piper Navajo and stored it on board a boat Haim operated. Frank Bahmann testified that Haim captained a boat bringing a load of marijuana into the United States. As noted above, the jury was free to disbelieve his alibi testimony. Furthermore, any confusion concerning dates or identification involved issues of credibility resolved by the jury. United States v. Sarro, 742 F.2d at 1295. Therefore, we hold that adequate evidence supports Haim's convictions for importation of cocaine and marijuana.
 
 F. Martin
 
 31
 Martin contends that the government failed to present sufficient evidence to support his convictions for conspiracy and importation of cocaine. The evidence revealed that Martin operated a radio within two miles of the Lakeland ranch and gave signals to clear the Piper Navajo for landing. Martin's participation in radio surveillance of law enforcement communications belies his claim of mere presence. Thus, we hold that adequate evidence supports Martin's conviction for conspiracy and importation of cocaine.
 
 III. Martin's Severance Motion
 
 32
 Martin contends that the district court erred in denying his motion for severance because out of the seventy-four overt acts listed in the conspiracy, he is named in only one. The testimony implicating Martin lasted no more than one hour out of a trial that took more than four weeks. Furthermore, none of the physical evidence introduced, including a videotape, implicated Martin. Martin argues that a separate trial would have taken less than one day and therefore would not have been burdensome to the courts. See United States v. Mardian, 546 F.2d 973, 980-81 (D.C.Cir.1976) (failure to sever reversible error where trial counsel became unavailable due to illness, prosecution did not oppose severance, and separate trial would be brief with few witnesses).
 
 
 33
 To determine whether the district court abused its discretion in refusing to sever, the interest of judicial economy and a policy of favoring joint trials in conspiracy cases must be weighed against Martin's allegations of prejudice. See United States v. Mota, 598 F.2d 995, 1000 (5th Cir.1979). Some degree of prejudice is inherent in every joint trial, but "only in the event such prejudice appears to be compelling does severance become warranted." United States v. Roper, 874 F.2d 782, 789 (11th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989) (quoting United States v. Perez, 489 F.2d 51, 65 (5th Cir.1973), cert. denied, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974)). To assess the presence of compelling prejudice, we look to all the circumstances of the particular case to determine whether the court's instructions sufficiently enabled the jurors to keep separate the evidence as relevant to each defendant. United States v. Roper, 874 F.2d at 789. Denial of a severance motion is reviewable only for an abuse of discretion. United States v. Broadwell, 870 F.2d 594, 605 (11th Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 125, 107 L.Ed.2d 85 (1989).
 
 
 34
 We hold that the district court's denial of Martin's motion to sever is not an abuse of discretion. Martin cannot demonstrate the degree of compelling prejudice required to outweigh the interests of judicial economy in the trial of a complex conspiracy case. See United States v. Dorsey, 819 F.2d 1055, 1058 (11th Cir.1987), cert. denied, 486 U.S. 1025, 108 S.Ct. 2002, 100 L.Ed.2d 233 (1988).
 
 IV. Declarations of Co-Conspirators
 
 35
 Harris contends that the district court should not have admitted Frank Bahmann's testimony to the effect that a day after a cocaine air drop into Bahamian waters, Munday told Bahmann that Munday had retrieved the cocaine from the water and had off-loaded it to "Bert" [Harris]. We reject Harris's contention that this statement was a "reminiscence" and not in furtherance of the conspiracy. See United States v. Phillips, 664 F.2d 971 (5th Cir. Unit B 1981), cert. denied, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982) ("retrospective statement" to co-conspirator inadmissible because not in furtherance of the conspiracy).[2]
 
 
 36
 The declaration of a conspirator which provides information to his co-conspirators in order to keep them abreast of the conspiracy's current status is admissible. United States v. Pool, 660 F.2d 547, 562 (5th Cir. Unit B 1981). We review whether a conversation was "in furtherance of a conspiracy" under the clearly erroneous standard. United States v. Posner, 764 F.2d 1535, 1537 (11th Cir.1985). We conclude that the district court properly admitted this testimony. Munday's declaration to Bahmann advised Bahmann of the location and manner in which the transfer of cocaine had been made, as well as the identity of the recipient. See United States v. Caraza, 843 F.2d 432, 436 (11th Cir.1988) (statement regarding third member of the conspiracy held to be in furtherance of the conspiracy).
 
 
 37
 V. Continuing Criminal Enterprise Instructions
 
 
 38
 Cardilli contends that the district court's instructions on the continuing criminal enterprise charge were improper because the instructions allowed the jury to convict based on an aiding and abetting theory. See United States v. Benevento, 836 F.2d 60 (2d Cir.1987), cert. denied, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988) (error to instruct the jury that it could convict under continuing criminal enterprise if defendant aided and abetted another in operating a continuing criminal enterprise). According to Cardilli, the jury could have considered a tape recording between Cardilli and an informant, Cary Cole, as evidence not of the commission of the predicate offenses underlying the continuing criminal enterprise charge, but of his aiding and abetting Munday and Coley in their supervision of five or more persons.
 
 
 39
 The district court gave the Eleventh Circuit pattern instruction for the continuing criminal enterprise charge. Cardilli made no objection to the instruction. It is defense counsel's duty to identify erroneous language in a jury instruction. United States v. Graziano, 710 F.2d 691, 696 (11th Cir.1983). Absent an objection by Cardilli, this court's inquiry on appeal concerns only whether the instruction constitutes an error. United States v. Graziano, 710 F.2d at 697. We hold that the district court's instruction to the jury was not erroneous.
 
 VI. Impeachment Testimony
 
 40
 Cardilli also contends that the district court's refusal to either subpoena Cole or permit Cardilli to impeach Cole's credibility violated Cardilli's constitutional right to confrontation, compulsory process, and due process. The district court ruled that Cole's credibility was not at issue and declined to admit the proffered testimony of five Louisiana police officers whose experience with Cole demonstrated his unreliability, according to Cardilli. The jury heard Cole's voice recorded on the tapes, but the government did not call him as a witness although he was on their pretrial witness list.
 
 
 41
 The evidence against Cardilli, however, came not from Cole, but from Cardilli's fellow co-conspirators, from Cardilli's own admissions on the videotape, and from statements Cardilli made to an undercover agent. Because Cole never testified, the district court properly exercised its broad discretion by not allowing Cole's credibility to become an issue. See United States v. Solomon, 686 F.2d 863, 874 (11th Cir.1982) (district court has broad discretion in ruling on the admissibility of character testimony).
 
 VII. Jury Question About FBI Reports
 
 42
 The FBI produced reports concerning its debriefing of Coley following his arrest. These reports were used extensively by defense counsel to refresh Coley's recollection during cross-examination and by the prosecution on redirect. The court gave the following instruction in response to the jury's question about whether the reports would be made available to the jury:
 
 
 43
 Ladies and gentlemen, about these reports, these FBI reports which have been used by counsel in examining this witness, and others, these are not verbatim statements of the persons being interviewed. They are on the other hand reports of trained investigators which generally speaking reflect the perception of the agent as to what the person being interviewed said. This kind of report may be used to refresh a person's recollection, and such reports may be helpful in that way, but they should not be considered by you as inconsistent because they are not truly statements of the person being interviewed. They are only the interviewer's perception of the information available through the interviewee.... I must inform you that these reports will not be available to you as part of the evidence in the case, but have some utility, and they have been given that utility, but they are not going to be available as part of the evidence in the case.
 
 
 44
 Cardilli contends that under rule 612 of the Federal Rules of Evidence, any "writing" used to refresh a witness's recollection may be introduced into evidence by the adverse party. See United States v. Nobles, 422 U.S. 225, 232 n. 6, 95 S.Ct. 2160, 2167 n. 6, 45 L.Ed.2d 141 (1975). Cardilli also contends that rule 613 of the Federal Rules of Evidence allows him to impeach the credibility of witnesses by examination concerning prior inconsistent statements and by introducing extrinsic evidence of such statements.
 
 
 45
 In determining whether the district court properly responded to a jury request, we consider whether the instructions as a whole fairly and correctly stated the applicable issues of law. United States v. Russell, 717 F.2d 518, 521 (11th Cir.1983). We hold that the district court's instructions regarding credibility and impeachment, taken as a whole, fairly and correctly stated the applicable law.
 
 VIII. Cardilli's Motion for a Byrd Severance
 
 46
 Prior to trial, Cardilli moved for severance and proffered the affidavits of five co-defendants. The affidavits stated that if Cardilli called each affiant to testify at a joint trial, each would invoke the fifth amendment; however, if called as witnesses at a separate trial, they would testify that Cardilli did not supervise them, pay for their services, or derive substantial income from such services. The magistrate ruled that the statements and the affidavits were irrelevant because the co-defendants were unwilling to make statements against their own penal interests. The magistrate found that, as a matter of law, an affidavit of a co-defendant stating that the defendant did not commit the crime could not be sufficient to warrant a severance unless the co-defendant also alleged who actually committed the crime. The district court denied the motion.
 
 
 47
 Cardilli argues that the co-defendants could deny that he was a manager or supervisor for purposes of the continuing criminal enterprise count without incriminating another person. For example, Cardilli argues, an alleged crew person could have been on board one of the boats at the time the narcotics were retrieved, but merely as an innocent bystander. Therefore, they could only testify that no one supervised them in a criminal activity.
 
 
 48
 To be entitled to severance, a defendant arguing that he needs a co-defendant's testimony must demonstrate (1) a bona fide need for the testimony, (2) the substance of the testimony, (3) its exculpatory nature, and (4) that a co-defendant would in fact testify if the cases were in fact severed. Byrd v. Wainwright, 428 F.2d 1017 (5th Cir.1970). Denial of a motion to sever is within the broad discretion of the district court. United States v. Machado, 804 F.2d 1537, 1544 (11th Cir.1986). To show that the district court abused its discretion, Cardilli must demonstrate that he suffered compelling prejudice as a result of the court's refusal to grant the severance. See United States v. Pruitt, 763 F.2d 1256, 1263 (11th Cir.1985), cert. denied, 474 U.S. 1084, 106 S.Ct. 856, 88 L.Ed.2d 896 (1986).
 
 
 49
 In United States v. DeSimone, 660 F.2d 532 (5th Cir.1981), cert. denied, 455 U.S. 1027, 102 S.Ct. 1732, 72 L.Ed.2d 149 (1982), the defendant similarly attempted to satisfy the criteria for severance set out in Byrd through an affidavit. In DeSimone, the court said that even if the defendant makes a facial showing comporting with Byrd, "the district court must then (1) examine the significance of the testimony in relation to the defendant's theory of defense, (2) assess the extent of prejudice caused by the absence of the testimony, (3) pay close attention to judicial administration and economy, and (4) give weight to the timeliness of the motion." DeSimone, 660 F.2d at 540. In DeSimone, the court found that the affidavit did not contain specific exonerative facts to which the co-defendant would testify if severed. The court also found the affidavit lacked credibility because it did not contravene the co-defendant's own penal interest. "Under these circumstances, we believe that any prejudice occasioned by the absence of Butler's testimony was outweighed by judicial economy considerations inherent in this complex conspiracy." DeSimone, 660 F.2d at 540.
 
 
 50
 As in DeSimone, the affidavits in this case contain only conclusory assertions that the affiants did not conspire with Cardilli nor he with them. The affidavits do not attest that the co-defendants were merely innocent bystanders as suggested by Cardilli, but if they did, such assertion would be self-serving and would undermine the credibility of the affidavits. Under these circumstances we hold that any prejudice resulting from the exclusion of their testimony was outweighed by considerations of judicial economy inherent in a complex conspiracy case. See also United States v. Pepe, 747 F.2d 632, 651 (11th Cir.1984) (denial of Byrd severance affirmed where proffered testimony conclusory and not against penal interest).
 
 IX. Cardilli's Absence From Trial
 
 51
 Cardilli contends that the district court erred by proceeding with the trial during his involuntary absence. During closing arguments by the defense, Cardilli became ill. As a result, he was absent during co-defendant's summation, the prosecutor's rebuttal summation, and the court's charge to the jury.
 
 
 52
 Cardilli's counsel waived any prejudice resulting from his absence by failing to object to proceeding with the trial in his absence. See United States v. Jones, 527 F.2d 817, 830 (D.C.Cir.1975) (prejudice due to absence waived by failure to object). During Cardilli's absence, Cardilli's counsel continued to vigorously represent Cardilli's interests. This court has found that a defendant's short absence during his trial is not significant when his attorneys are present at all times. Finney v. Zant, 709 F.2d 643, 646 (11th Cir.1983), overruled on other grounds, Peek v. Kemp, 784 F.2d 1479 (11th Cir.), cert. denied, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).
 
 
 53
 X. Separate Convictions and Sentences for Conspiracy and Continuing Criminal Enterprise
 
 
 54
 The government concedes that the conspiracy and continuing criminal enterprise charges against Cardilli merge because the conspiracy to import narcotics charge is the lesser included offense of continuing criminal enterprise. United States v. Michel, 588 F.2d 986, 1001 (5th Cir.), cert. denied, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). Because the charges are merged, we vacate the conviction and sentence of the lesser included offense of conspiracy.
 
 CONCLUSION
 
 55
 In summation, we reverse Bucchiere's conviction for insufficient evidence and vacate Cardilli's conviction and sentence for conspiracy. On all remaining issues, we affirm.
 
 
 56
 REVERSED in part, VACATED in part, and AFFIRMED.
 
 
 57
 ANDERSON, Circuit Judge, concurring in part and dissenting in part:
 
 
 58
 I concur in all of the opinion for the court, except with respect to the juror misconduct issue. I disagree with the majority's conclusion that the two remarks are ambiguous.
 
 
 59
 With respect to the first remark--"these guys sitting across from us think they're going to get off on this"--I agree with the district court that "the most logical interpretation of it" was that it conveyed "some conclusion adverse to the defendants." I conclude that this remark reflects a premature opinion on the part of the juror, voiced on the second day of a four-week trial.
 
 
 60
 Nor can I conclude that the second remark is ambiguous. The remark was made by one of the two jurors involved in the first remark. The remark was made from the jury box when a DEA agent was about to testify. Under these circumstances, it seems clear to me that the remark--"do it to him good"--unambiguously indicates a premature opinion on the part of the juror. Moreover, the tenor of the remark indicates that the premature opinion was held with considerable intensity, increasing the difficulty that the juror could set aside the opinion and rely solely on the evidence.
 
 
 61
 In cases of "speculative or unsubstantiated allegation[s] of misconduct" (majority at 734), the obligation of the district court to investigate is light; however, I cannot conclude that this is such a case. Rather, I conclude that the remarks in this case represent a serious indication of jury contamination, and thus triggered a heavier burden on the part of the district court to investigate. With respect to this issue, I respectfully dissent.
 
 
 
 [1]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981), the court adopted as precedent all decisions of the former Fifth Circuit Court of Appeals decided prior to October 1, 1981
 
 
 [2]
 In Stein v. Reynolds Securities, 667 F.2d 33, 34 (11th Cir.1982), this court adopted as binding precedent all of the decisions of Unit B of the former Fifth Circuit