**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Joseph LaSPESA, Victor E. Murgo,**
**Steven A. Sarault, Aime J. Sarault,**
**Defendants–Appellants.**

No. 85–3131.

United States Court of Appeals,
Eleventh Circuit.

March 27, 1992.

James J. Cally, pro se.

Joseph E. Ashmore, Jr., C. Gregory Shamoun, Dallas, Tex., for Joseph LaSpesa.

Jake Arbes, Atlanta, Ga., for Victor E. Murgo.

Stephen A. Sarault, pro se.

J. William Masters, II, Orlando, Fla., for Aime J. Sarault.

Stephen J. Calvacca, Walter J. Postula, Geoffrey R. Brigham, Asst. U.S. Attys., Miami, Fla., for U.S.

Before HATCHETT and BIRCH, Circuit Judges, and MORGAN, Senior Circuit Judge.

HATCHETT, Circuit Judge:

In this criminal case involving a scheme to defraud business loan seekers, we affirm the convictions and sentences.

## FACTS

Appellants, Victor E. Murgo, Joseph LaSpesa, Aime J. Sarault, and Stephen A. Sarault, duped financially pressed entrepreneurs into paying large advance fees in exchange for worthless promises to secure business loans. Although each victim paid thousands of dollars to appellants, none received a penny in business financing. The following recitation of the facts is a general description of the scheme.

Victor Murgo, the head of Murgo and Sanborn Associates, gained clients through newspaper advertisements which offered credit to financially strapped entrepreneurs. Each client paid Murgo $5,500 to $9,650 for "preliminary approval" and a "feasibility study" of the project the client sought to have financed. Murgo's Canadian associate, Sydney Solomons, would then take $3,000 from the client in "application fees."

Murgo used a fancy brochure and other materials which misrepresented his educational and professional background to reassure clients that he was qualified to deal in the world of high finance. The literature identified Murgo and Sanborn as a subsidiary of "the Travelers Corporation," and Murgo did little to discourage the belief that "Travelers" was the same as the well known insurance company. The feasibility studies for which Murgo charged $4,500 to $8,200 were little more than glossy repackaging of information secured from clients.

After completion of the feasibility study and payment of the associated fees, Murgo referred clients to purported loan brokers, either Univest Financial Fund, Ltd. (Univest) in Denver, or "Silver Funding" in Hastings-on-Hudson, New York. Lloyd Rubin, who headed Univest, or Christopher Uzzi and Joseph Attonito, who headed Silver Funding, took another $5,000 from each client for "credit guarantees." American Casualty and Indemnity Company (American Casualty), Merchants Bank of Commerce (Anguilla), Ltd. (Merchants Bank), or both, then provided the guarantees. Stephen Sarault acted as attorney for American Casualty and as general counsel of Merchants Bank. Aime Sarault, Stephen's father, was chairman of Merchants Bank and the owner of its common stock. Joseph LaSpesa was the principal preferred shareholder of Merchants Bank and a purported tycoon who claimed to own gold reserves around the world.

American Casualty and Merchants Bank showed clients bogus financial statements indicating that they had hundreds of millions of dollars worth of assets. Most of this amount consisted of "precious metal delivery certificates," purportedly backed by LaSpesa's gold mines. These mines, in fact, were geologically worthless, and LaSpesa defaulted on the purchase payments for them.

After the brokers referred a client to Merchants Bank, Steven Sarault would demand $5,000 for another feasibility study on the client's proposed project. Merchants Bank would then accept the project

and issue a "letter of commitment," promising to issue a letter of credit in exchange for a one percent fee. For the few clients who paid the one percent fee, Merchants Bank then issued a letter of credit. No bank ever honored the letters of commitment or letters of credit. Following such refusals, appellants continued the scheme with promises of personally guaranteed letters of credit from the purported tycoon, LaSpesa, or with offers of participation in a "borrower's syndication."

Appellants received amounts ranging from $6,000, that a New York college professor gave them to finance a highway rest area called "Traveltown," to $66,350, that two Ohio businessmen gave them to refinance their real estate loans. A Maine businessman paid appellants over $54,000 in advance fees only to lose another $35,-000 in forfeited deposits on properties he was unable to buy when the promised financing never materialized. Appellants' received from the victims named in the indictment approximately $373,000 over a four-year period between 1978 and 1982.

## PROCEDURAL HISTORY

A jury convicted LaSpesa, Murgo, Aime Sarault, Stephen Sarault, and James Cally of mail fraud and conspiracy to commit mail fraud (Counts I and II, respectively).[1] The jury also convicted Murgo on two additional counts of mail fraud and conspiracy to commit mail fraud (Counts IV and V), and twenty counts of illegal transportation of money taken by fraud (Counts VI through XII and XIV through XXVI).

On May 11, 1983, two months after the jury returned its verdict, the district court granted appellants' motion to set aside the guilty verdicts and enter a judgment of acquittal. Two days later, the district court filed a supplemental memorandum, explaining that it had intended only to acquit all the appellants of Counts I and II, and to grant a new trial to Murgo on all the remaining counts for which he had been convicted. Because the district court believed it could not change its first order "without raising serious jeopardy prob-

lems," it invited the appeals court to reverse and remand for a new trial Murgo's convictions on Counts IV through XII and Counts XIV through XXVI. Instead, the government filed a motion for reconsideration. On August 24, 1984, the district court granted the government's motion and reinstated the jury verdicts against all the appellants. An appeal followed.

In October, 1986, this court remanded the case to the district court for correction of the record because transcripts were missing from the file. The district court clerk supplemented the record. Appellants then moved in this court for summary reversal on the ground that items were still missing from the record. On January 9, 1989, this court again remanded the case to the district court for a reconstruction of the record pursuant to Federal Rule of Appellate Procedure 10.

Following a reconstruction hearing, the district court filed a forty-page "Report of Limited Remand." The district court recommended a new trial for Murgo on Counts IV and V of the indictment because of a missing transcript. The court also recommended affirmance of the reinstated guilty verdicts on all other counts.

## ISSUES

(1) Whether the evidence was sufficient to support the jury's finding of a single conspiracy; (2) whether the district court erred in joining the appellants and the charges for one trial; and in denying the motions to sever; (3) whether the trial court erred in refusing to grant a mistrial after the judge's law clerk make unauthorized remarks to jurors during the trial; (4) whether reinstatement of the guilty verdicts violated the Double Jeopardy Clause of the Fifth Amendment to the U.S. Constitution; (5) whether the district court erred in its reconstruction of the record; (6) whether the evidence was sufficient to support appellants' convictions under 18 U.S.C. § 2314, the transportation of stolen money statute; (7) whether the trial court committed plain error in allowing certain state-

---

**1.** James Cally, LaSpesa's attorney, died while    this appeal was pending.

ments made in the prosecutor's closing argument; (8) whether the evidence was sufficient to show that certain appellants possessed fraudulent intent and knowingly participated in the conspiracy; (9) whether the trial court erred in admitting the testimony of Raymond Maciejczak.

## DISCUSSION

### A. Joinder, Severance, and the Single Conspiracy

Appellants contend that the evidence adduced at trial showed two conspiracies: one involving LaSpesa, Cally, and Uzzi, and the second involving Murgo, Uzzi, Attonito, the two Saraults, and others. Based upon their argument that the evidence was insufficient to show the existence of a single conspiracy, appellants argue that the trial court erred in denying their rule 8(b) misjoinder motions and their rule 14 severance motions. The government argues that the evidence supported the existence of a single conspiracy, and that the district court did not err in denying the misjoinder and severance motions.

### 1. Sufficiency of the Evidence

■ Where the indictment charges a single conspiracy, but the evidence adduced at trial shows multiple conspiracies, the convictions must be reversed if appellants can demonstrate that they were prejudiced by the variance between the indictment and the evidence. *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *United States v. Khoury*, 901 F.2d 948, 956 (11th Cir.1990); *United States v. Caporale*, 806 F.2d 1487 (11th Cir.1986), *cert. denied*, 483 U.S. 1021, 107 S.Ct. 3265, 97 L.Ed.2d 763 (1987). The jury makes the initial determination of whether the evidence supports the single conspiracy charged in the indictment. *Khoury*, 901 F.2d at 956. As with other challenges to the sufficiency of the evidence, the decision of the jury will not be disturbed if supported by substantial evidence. *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). In viewing the jury's verdict, this court must take the evidence in the light most favorable to the government. *Glasser*, 315 U.S. at 80, 62 S.Ct. at 469; *United States v. Correa-Arroyave*, 721 F.2d 792, 796 (11th Cir. 1983).

■ In determining the existence of a single conspiracy, we examine three factors: (1) whether the conspirators shared a common goal; (2) the nature of the scheme; and (3) the overlap of participants. *Khoury*, 901 F.2d at 956. Applying this standard, the jury could easily find that the appellants were bound together in a "mutually beneficial scheme." *See United States v. Cole*, 704 F.2d 554, 557 (11th Cir.1983). As the district court noted in its order reinstating the verdicts:

> On each successive level: money is taken up front; the illusion of results is created; the deal falls through; the prospective borrower is sent to the next level. Ultimate success depends upon a continual flow of new levels. Thus, while LaSpesa is admittedly a newcomer on the already commenced scheme, his role, though not his identity, was contemplated from its inception. Likewise, the fact that prior participants such as the Saraults would fade into the background was also contemplated by the overall scheme. Therefore, neither the Saraults' departure nor LaSpesa's joinder had the effect of breaking up the old conspiracy or creating a new one. The scam continues until the prospective borrower gives up, wises up, or is financially drained and thus unattractive for further purposes. Similar to most sophisticated financial schemes to defraud, expansion and the changing of actors was an integral part of its nature. [Footnotes and citations omitted.]

The appellants in this case shared a common goal of profiting from a plan to take advance fees in exchange for promises to secure loans. The evidence showed interrelationships between all the appellants named in the indictment: Murgo's clients were consistently referred to Uzzi, Attonito, and the Saraults; the Saraults were in business with LaSpesa; when Murgo's clients expressed frustration with the lack of results from the Saraults, Murgo prom-

ised them that LaSpesa would provide new opportunities.

The common goal of the conspirators, the mutually beneficial nature of the scheme, and the overlap of participants all support the jury's finding of a single conspiracy under the *Khoury* standard.

### 2. *Joinder and Severance*

■ Although we have reviewed the evidence to determine whether it was sufficient to show a single conspiracy, we look only to the face of the indictment to determine whether joinder was proper. *United States v. Morales*, 868 F.2d 1562, 1567–68 (11th Cir.1989). Because the indictment sufficiently alleged that all of the defendants were involved "in the same series of acts or transactions constituting an offense or offenses," joinder was proper under rule 8(b). Fed.R.Crim.P. 8(b). In addition, the district court did not err in denying appellants' rule 14 motions to sever.

■ The district court's denial of a motion for severance will be reversed on appeal only for abuse of discretion. *Morales*, 868 F.2d at 1571. Appellants carry a heavy burden on appeal. They must show "compelling prejudice" as a result of the joint trial, such that the jury was "incapable of independently evaluating the evidence against each defendant." *United States v. Hernandez*, 921 F.2d 1569, 1578 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 2271, 114 L.Ed.2d 722 (1991); *United States v. Corbin*, 734 F.2d 643, 650 (11th Cir.1984).

The appellants cannot show compelling prejudice. First, as discussed above, the evidence was sufficient to support a finding that they were involved in the same conspiracy charged in Counts I and II of the indictment. Second, as to the remaining counts, the district court carefully provided cautionary instructions linking each charge to each appellant, and each victim witness to each relevant count of the indictment. *See United States v. Alvarez*, 755 F.2d 830, 857 (11th Cir.), *cert. denied*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235

(1985) (prejudice must be "clearly beyond the curative powers of the cautionary instruction") (quoting *United States v. Phillips*, 664 F.2d 971, 1017 (5th Cir. Unit B 1981)). Third, the jury's mixed verdict showed, at least to some degree, that it effectively linked the evidence to the appellants and "refuted any allegation of compelling prejudice." *Hernandez*, 921 F.2d at 1580 (citations omitted).[2] Thus, we find no "specific instances of prejudice in the record and verdict" to justify reversal of the district court's denial of appellants' rule 14 motions to sever. *Hernandez*, 921 F.2d at 1580.

### B. Statements to the Jury By the Judge's Law Clerk

During a recess in the trial, while three jurors were playing cards, the district judge's law clerk entered the jury room to fill a water pitcher. One of the jurors asked the law clerk whether, if appellants were convicted, they had a right to appeal. The clerk replied, "Normally, if the government loses, that's the end of the case. There's no right of appeal for the government. But if the defendants should lose, they have a right of appeal as a matter of right."

The trial judge related this version of the law clerk's statement when he called counsel into the courtroom before the return of the jury. During this proceeding, the law clerk confirmed for the court, on the record, that the judge had accurately described his conversation with the jurors. The court denied appellants' motions for mistrial, but directed the parties to file memorandum briefs on the issue. Appellants renewed their motions for mistrial at the close of the government's case, and after considering the memoranda, the court denied the motions.

■ Appellants contend that the district court abused its discretion by denying the motions for mistrial and by not holding an evidentiary hearing to determine wheth-

---

**2.** For example, the jury could not agree on Counts I and II of the indictment as to Lawrence J. Mancini, and on Counts IV and V as to

Herbert R. Williams. In addition, the jury acquitted all appellants on Count III of the indictment.

er the jury was prejudiced by the law clerk's remarks. The government responds that the district court had broad discretion to determine the type of investigation required to determine prejudice, and could properly find that jury instructions would cure any prejudice.

The law of the Eleventh Circuit is uniform in holding that the district court has broad discretion to choose the "inquisitorial tools ... necessary and appropriate to determine prejudice" where juror misconduct or extrinsic influences are alleged. *United States v. Rowe*, 906 F.2d 654, 656–57 (11th Cir.1990); *United States v. Harris*, 908 F.2d 728, 733 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 979, 112 L.Ed.2d 1063 (1991). In this case, the district court did not abuse its discretion in declining to question jurors in a full evidentiary hearing. Such a hearing would have had little purpose because the content of the clerk's remarks and the extent of their circulation were not in dispute. In addition, the court heard testimony from the law clerk, entertained oral argument from counsel, and took briefs on the question of whether the clerk's remarks justified a mistrial. We cannot say that the procedure the district court followed failed to comply with *Harris*'s holding that a "hearing" must be held when the jury is subjected to outside influences. *Harris*, 908 F.2d at 733. Obviously, no evidentiary hearing is required when no facts are in dispute. As our cases require, the district court "fully investigated" the incident to the extent the particular facts warranted. *See Harris*,

908 F.2d at 733; *United States v. Brantley*, 733 F.2d 1429, 1439 (11th Cir.1984), *cert. denied*, 470 U.S. 1006, 105 S.Ct. 1362, 84 L.Ed.2d 383 (1985); *United States v. Caldwell*, 776 F.2d 989, 998 (11th Cir.1985).

■ The district court properly found that the clerk's remarks were not sufficiently prejudicial to justify a mistrial. This court has held that similar extrinsic influences on jurors did not taint the verdicts. *See United States v. Dynalectric Co.*, 859 F.2d 1559 (11th Cir.1988) (juror's consultation of notes from health law class); *United States v. De La Vega*, 913 F.2d 861 (11th Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 2011, 2012, 114 L.Ed.2d 99 (1991) (juror's consultation of book entitled "What You Need to Know for Jury Duty"). The district court could properly find that any further discussion of the matter with the jury would have only underscored the improper statements. *See United States v. Sababu*, 891 F.2d 1308, 1332 (7th Cir.1989); *United States v. Williams*, 822 F.2d 1174, 1189–90 (D.C.Cir.1987). In addition, the court instructed the jury that it was not to consider matters relating to the ultimate disposition of the case, nor any extraneous comments heard outside the trial context.[3] We must presume that the jurors followed this instruction. *Francis v. Franklin*, 471 U.S. 307, 326 n. 9, 105 S.Ct. 1965, 1976 n. 9, 85 L.Ed.2d 344 (1985).

Thus, we hold that the district court adequately investigated the possibility of prejudice from the law clerk's remarks and did

---

**3.** The district court instructed the jury:
[You shall not be] concerned in any manner with what may happen to this case or any other related case in the future. You are concerned only with this case as to the defendants on trial as it exists at this moment. You are not to speculate what the future holds forth for the defendants on trial or any other defendant previously tried (except as to the credibility of any defendant who has testified), or any other person in a related case.

It is always possible that, in a case such as this which has required many weeks to try, you may have heard some comment in a room other than the courtroom—in a hallway, in an elevator, or even outside the courthouse—which may possibly relate in some

manner to this case ... [Y]ou may have overheard some comment from a witness, some court personnel, an attorney or a Government prosecutor, a Government agent, a casual acquaintance or neighbor, or even a defendant. I charge you that you should and must totally disregard any such comment in your consideration as to the guilt or innocence of any and all defendants. Stated otherwise, as I have already said, you must, under the oath you took, decide the case solely upon the evidence admitted by me during the trial in the open courtroom, the exhibits admitted in evidence by me, the law of the case as contained in this charge, and such other statement of law made to you by me during the course of the actual trial.

not abuse its discretion in refusing to grant a mistrial.[4]

### C. Double Jeopardy Issue

■ Appellants contend that the district court exceeded its jurisdiction when it reconsidered its own judgment of acquittal and reinstated the jury's guilty verdicts. More importantly, appellants contend that the district court's reconsideration of the acquittal constituted a clear violation of the Double Jeopardy Clause. Because the district court granted acquittal on the ground that the evidence was insufficient to support the jury's finding of a single conspiracy, and then reinstated the verdicts upon reconsideration of that evidence, appellants argue that the reconsideration amounted to a second trial. Thus, appellants contend, they were twice put in jeopardy of life and limb, in violation of the Fifth Amendment to the United States Constitution.

Appellants' contentions are without merit. A district court has "plenary power ... to modify [its] judgment for error of fact or law, or even to revoke it altogether." *Zimmern v. United States*, 298 U.S. 167, 169–70, 56 S.Ct. 706, 707, 80 L.Ed. 1118 (1936). Because the district court is often in the best position to correct its own errors, allowing it to do so promotes judicial economy. *See United States v. Dieter*, 429 U.S. 6, 8, 97 S.Ct. 18, 19, 50 L.Ed.2d 8 (1976). Contrary to appellants' contentions, these considerations apply with equal force where the decision under reconsideration is one affecting final judgment. *See United States v. Cook*, 670 F.2d 46, 48 (5th Cir.1982), *cert. denied*, 456 U.S. 982, 102 S.Ct. 2255, 72 L.Ed.2d 860 (1982) (although not explicitly authorized by Federal Rules of Criminal Procedure, rehearing and reconsideration are "undoubtedly ... legitimate").

■ On the facts of this case, reconsideration did not violate the Double Jeopardy Clause. The key question under the Double Jeopardy Clause is whether a success-ful appeal by the government will result in further litigation of factual issues on remand to the district court. *United States v. Greer*, 850 F.2d 1447, 1449 (11th Cir. 1988). If it will, such an appeal is barred. But the appeals court may review the district court's judgment of acquittal where the only result of a successful government appeal can be reinstatement of the jury's verdict. *Greer*, 850 F.2d at 1449. In such cases, neither the jury nor the court makes further fact finding, and thus, the Double Jeopardy Clause is not violated.

■ For precisely the same reasons, a district court is empowered to reconsider a judgment of acquittal it has imposed, where reconsideration can result only in reinstatement of the jury verdicts or affirmance of the acquittal. As with an appeal, no further fact finding is required. The fact that the reconsideration focuses upon the sufficiency of the evidence does not change this result. When a court reviews the sufficiency of the evidence, it is not conducting a second trial. *Greer*, 850 F.2d at 1449 n. 5. Thus, we hold that the evidentiary review did not put the appellants twice in jeopardy of life or limb.

### D. Reconstruction of the Record

■ Appellants also contend that the omission of five transcript portions and one exhibit constitute "substantial and significant" omissions from the record requiring reversal. Appellants further argue that the district court's reconstruction hearing did not cure these omissions, because the court did not afford appellants due process in that proceeding. The government contends that appellants waived the right to object to the district court's reconstruction report, and that, in any event, the omissions were not substantial and significant.

This court has held that substantial or significant omissions from the record require reversal where new counsel represent defendants on appeal. *United States v. Selva*, 559 F.2d 1303, 1306 (5th Cir.1977).

---

**4.** We note also that in extrinsic influence cases, "the strength of the government's case has a bearing on the issue of prejudicial error." *United States v. Rowe*, 906 F.2d 654, 657 (11th Cir. 1990). Here, given the strength of the government's case, the law clerk's remark, while improper, was unlikely to have a determinative effect on the jury verdicts.

In *United States v. Preciado–Cordobas,* 923 F.2d 159 (11th Cir.1991), we explained that the court premised the *Selva* holding upon the district court's inability to reconstruct the record. *Preciado–Cordobas,* 923 F.2d at 160. In this case, the district court undertook a careful reconstruction of the record in accordance with Federal Rule of Appellate Procedure 10(e). As in *Preciado–Cordobas,* the district court called upon former defense counsel, prosecutors, and court reporters to assist in the reconstruction effort. *See Preciado–Cordobas,* 923 F.2d at 160–61. Thus, because the reconstruction effort was adequate, the missing transcripts did not hamper appellants' ability to pursue an effective appeal. *See Morgan v. Massey,* 526 F.2d 347, 348 (5th Cir.), *cert. denied,* 429 U.S. 1002, 97 S.Ct. 533, 50 L.Ed.2d 613 (1976). In light of the procedural and substantive adequacy of the district court's effort to reconstruct the record, we hold that it did not abuse its discretion in finding no prejudice to appellants from the missing materials, and no significant or substantial omissions from the record.

### E. Other Issues

#### 1. The Scope of 18 U.S.C. § 2314

■ Appellants contend that, at the time of trial, 18 U.S.C. § 2314 did not prohibit interstate wire transfers of stolen money. Appellants cite *United States v. Johnpoll,* 739 F.2d 702 (2d Cir.), *cert. denied,* 469 U.S. 1075, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984) to argue that the statute's proscription against interstate or foreign "transport" of stolen money did not apply to wire transfers. This argument is without merit. Every federal circuit court which has ruled on the issue has held that the old version of section 2314 applied to wire transfers. *See, e.g., United States v. Goldberg,* 830 F.2d 459, 466–67 (3d Cir. 1987); *United States v. Wright,* 791 F.2d 133, 136–37 (10th Cir.1986). Even the Second Circuit, which decided *Johnpoll,* has rejected any inference that the case should be interpreted as finding section 2314 inapplicable to wire transfers. *United States v. Gilboe,* 684 F.2d 235, 238 (2d Cir.1982), *cert. denied,* 459 U.S. 1201, 103 S.Ct. 1185, 75 L.Ed.2d 432 (1983).

#### 2. Prosecutor's Closing Argument

■ Murgo contends that the trial court erred in allowing the prosecutor to state three times in his closing argument that Victor Murgo had never procured a single loan for any client. Murgo argues that this statement was a bald misrepresentation. In fact, he argues, the prosecution possessed an F.B.I. report in which one Dwayne A. Tucker stated that Murgo assisted him in securing a $300,000 loan.

Because Murgo's trial attorney did not object to the prosecutor's closing argument, we review it for plain error. We find none. Joseph Beaulieu, a cooperating witness and former employee of Murgo's firm, testified at trial that he had no personal knowledge of the Tucker transaction, had never seen any documents relating to it, and never remembered Murgo obtaining funding for any client. In short, it is not clear that the prosecutor's statement was false. The overwhelming evidence that Murgo bilked some twenty-two clients for hundreds of thousands of dollars without ever providing them with any of the promised results was sufficient to support the conclusion that Murgo was guilty. In light of that evidence, it is unlikely that the prosecutor's statement played a significant role in the jury's decision.

#### 3. Fraudulent Intent

■ Murgo and Aime Sarault contend that the evidence was insufficient to support a finding of fraudulent intent or knowing participation in the alleged conspiracies. This contention is also without merit. The jury could easily infer fraudulent intent from Murgo's pattern of conduct. *See United States v. Funt,* 896 F.2d 1288, 1292 (11th Cir.1990). Murgo lied to his clients prolifically about everything from his own education and experience to the "success rate" of his firm in securing loans. The evidence showed that Aime Sarault, the chairman of Merchant's Bank, signed a financial statement which grossly exaggerated the bank's assets and supported the

undertaking of credit commitments which he knew the bank could not fulfill. Thus, we hold that the evidence was sufficient to support a finding of fraudulent intent and of knowing participation in the conspiracy charged.

### 4. Admission of the Maciejczak Testimony

■ Finally, appellants contend that the district court erred in admitting the testimony of Raymond Maciejczak regarding an incident not charged in the indictment. Maciejczak testified that he paid LaSpesa and Cally $80,000 in fees to obtain a loan which they never provided. We hold that admission of the Maciejczak testimony was not error. The Maciejczak transaction, which occurred in September, 1980, was virtually identical to the transactions described in the indictment, and was highly probative of LaSpesa's and Cally's fraudulent intent with respect to the charged transactions. Extrinsic evidence is admissible to prove intent. Fed.R.Evid. 404(b); *United States v. Beale*, 921 F.2d 1412, 1427 (11th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 100, 116 L.Ed.2d 71 (1991). Moreover, the events described in the Maciejczak testimony were so integral to the offenses charged in the indictment that the testimony may not have even constituted "extrinsic" evidence falling within the limitations of rule 404(b). *See United States v. Foster*, 889 F.2d 1049, 1053 (11th Cir. 1989). Thus, the district court did not abuse its discretion in admitting this evidence.

### CONCLUSION

For the foregoing reasons, the appellants' convictions and sentences are affirmed.

AFFIRMED.