[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-13218

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

PATRICK EMEKA IFEDIBA,
NGOZI JUSTINA OZULIGBO,

Defendants-Appellants.

2                      Opinion of the Court                      20-13218

_____

Appeals from the United States District Court
for the Northern District of Alabama

D.C. Docket No. 2:18-cr-00103-RDP-GMB-1

_____

_____

No. 20-13303

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

NGOZI JUSTINA OZULIGBO,

Defendant- Appellant.

_____

Appeals from the United States District Court
for the Northern District of Alabama

D.C. Docket No. 2:18-cr-00103-RDP-GMB-4

_____

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

JILL PRYOR, Circuit Judge:

Siblings Patrick Ifediba and Ngozi Justina Ozuligbo appeal their convictions for health care fraud and related crimes. Ifediba, a physician, operated a clinic called CCMC[1] and employed Ozuligbo, a licensed practical nurse, there. The evidence at trial showed that CCMC prescribed large quantities of opioids to patients who had no medical need for them and ran an allergy-testing and treatment scheme in which it required insured patients to undergo allergy testing and prescribed them medication despite their negative allergy tests. The clinic billed Medicare and private insurers for the tests and treatments.

Ifediba and Ozuligbo were indicted on substantive counts of health care fraud, conspiracy to commit health care fraud, money laundering of the clinic's unlawful proceeds and conspiracy to commit that crime. Ifediba was indicted for unlawfully distributing controlled substances for no legitimate medical purpose and for operating CCMC as a "pill mill" to distribute the controlled substances to patients who had no medical need for them.

---

[1] In the record, CCMC is referred to both as "Care Complete Medical Clinic" and "Complete Care Medical Clinic."

Before trial, the court excluded Ifediba's evidence of good care he provided to his patients because it was intended to prove that his medical practice was legitimate. It also excluded Ozuligbo's evidence that cultural norms of their Nigerian heritage required her to obey her older brother, Ifediba. During trial, the district court dismissed an alternate juror when it came to light that the alternate had independently researched the case outside of court and discussed the case with coworkers. Though Ifediba and Ozuligbo asked the court to question the remaining jurors individually to discover whether the alternate had discussed her research with them, the court instructed the jury collectively instead. The court denied the defense's motion for a mistral. After a three-week trial featuring testimony by CCMC patients, medical experts, and law enforcement officials, the jury convicted Ifediba and Ozuligbo on all counts. The court sentenced Ifediba to 360 months of imprisonment and Ozuligbo to 36 months.

Ifediba appeals the district court's exclusion of his good-care evidence and its decision to address the jury collectively rather than individually. He also challenges the sufficiency of the evidence supporting those of his substantive health care fraud convictions that were based on evidence from medical records rather than patient testimony. And he appeals his sentence by disputing the district court's drug-quantity calculation on which the sentence was based. Ozuligbo appeals the court's exclusion of her cultural-defense evidence and the sufficiency of the evidence supporting her health

care fraud conspiracy conviction. After careful consideration and with the benefit of oral argument, we affirm.

## I.      BACKGROUND[2]

In this section, we briefly introduce CCMC's controlled-substances distribution practice before focusing on the clinic's allergy fraud scheme, which was the basis for the health care fraud convictions. We then discuss the juror misconduct issue that arose at trial and the district court's resolution of it. Finally, we describe the defendants' convictions and sentences.

## A.      CCMC Operated as a Pill Mill and Required Insured Patients to Undergo Allergy Testing and Treatment.

Ifediba and his wife, Uchenna Ifediba ("Uchenna"), also a physician, were the only physicians at CCMC. Neither Ifediba nor his wife specialized in pain-management medicine, but they wrote many prescriptions for controlled substances—opioids, like oxycodone and fentanyl, and benzodiazepines, like Xanax. CCMC attracted patients who were willing to wait over three hours in a dirty, crowded waiting room to receive prescriptions for controlled substances. The clinic stayed open until 10:00 PM to accommodate them. After law enforcement received tips that CCMC was

---

[2] Because Ifediba and Ozuligbo challenge the sufficiency of the evidence supporting some of their convictions, we recite the facts in the light most favorable to the jury's verdict. *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989).

prescribing controlled substances to people who did not need them, the clinic became the subject of a Drug Enforcement Agency ("DEA") investigation.

Besides its opioid distribution, CCMC roped patients who had insurance into an allergy fraud scheme. The allergy scheme began after Ifediba met Clement Ebio. Ebio connected CCMC with Allergy Services of North America ("ASNA") and coordinated a joint undertaking by the two organizations. ASNA would provide the allergy-testing equipment and immunotherapy treatments, and Ifediba, through CCMC, would bill patients' insurance for the allergy services.

The scheme was a simple one. Every insured patient who came to CCMC had to fill out a questionnaire on allergy symptoms before seeing the doctor. No matter the patient's answers, an allergy technician performed a skin-prick allergy test on the patient. Regardless of whether the test results were positive or negative, Ifediba prescribed immunotherapy to treat allergies and directed the technicians to order the medication. Some patients without allergies actually received immunotherapy treatment; others did not. Either way, CCMC billed insurers over $500 per test and over $2,000 per patient for immunotherapy. By contrast, CCMC did not perform allergy tests on uninsured patients.

Ozuligbo had been working as the clinic's office manager, but Ifediba told Ebio to hire her as an ASNA allergy technician. Ebio balked at the request because ASNA had enough technicians and Ozuligbo would be paid twice as much as the others. He

eventually relented, however, accepting that bringing her on was part of the "cost of doing business" with Ifediba. Doc. 251 at 85.[3]

As an allergy technician employed by ASNA but working on-site at CCMC, Ozuligbo was responsible for patient intake, drawing blood, performing allergy testing, and administering immunotherapy. She determined which insured patients would be tested after contacting patients' insurers to confirm coverage of the allergy tests and treatment. When a patient came in for an appointment, Ozuligbo filled out the paperwork required for the allergy test. If the patient expressed reluctance about taking the test, Ozuligbo persuaded him. At least one reluctant patient understood the allergy test to be "part of the process to see Dr. Patrick [Ifediba]." Doc. 248 at 105. Ozuligbo performed the tests and recorded the results.

Medical records introduced at trial showed that even when patients tested negative for allergies, Ifediba prescribed immunotherapy, and Ozuligbo distributed it to patients. Ozuligbo filled out patient files noting that she gave those patients the immunotherapy injections that Ifediba had prescribed. Once, she added a note to a patient's file that the patient's symptoms had improved after immunotherapy when, in fact, the patient had tested negative for allergies and had not received immunotherapy at all.

---

[3] "Doc." numbers refer to the district court's docket entries.

Other patients also failed to receive the immunotherapy treatment their insurers paid for. For example, a CCMC employee told one patient who had tested negative for allergies to come to the clinic to receive his allergy shot. He refused to get the shot and told CCMC not to bill his insurance for it. CCMC nonetheless billed his insurer $2,660 for allergy treatment. And when investigators executed a search warrant on CCMC, it found under a table a big box of "unopened and unused" vials of allergy immunotherapy medicine, apparently discarded. *Id.* at 133.

Insurer Blue Cross Blue Shield of Alabama ("BCBS") noticed the unusually high volume of allergy-related claims coming from CCMC and announced that it would audit the clinic. In preparation for the audit, Ifediba told clinic staff, including Ozuligbo, to change patient records, turning negative allergy test results to positive and marking allergy symptoms on the patient questionnaires. Yet BCBS managed to uncover the fact that patients had not needed the allergy tests or treatment. It requested a refund of about $220,000 in benefits paid to CCMC for allergy services. It also informed the Federal Bureau of Investigation ("FBI") that CCMC could be committing health care fraud. Because the government was already investigating Ifediba's controlled-substance prescription practices, the FBI joined the DEA's existing investigation.

Agents searched CCMC's premises and, on the same day, interviewed Ozuligbo at her home. By that time, she had stopped working at the clinic. Ozuligbo initially answered the agents' questions about her work at CCMC. But when they brought out patient

records showing that she had logged immunotherapy injections for patients who had tested negative for allergies, she refused to speak further.

A grand jury indicted Ifediba and Uchenna, charging them with multiple counts of unlawfully distributing controlled substances outside the course of professional practice and for no legitimate medical purpose. They were also indicted for conspiracy to distribute the controlled substances and for using and maintaining CCMC for the purpose of distributing controlled substances. All these charges concerned the prescribing of pain-management substances.

The indictment also charged Ifediba, Uchenna, Ozuligbo, and Ebio with conspiracy to commit health care fraud through the allergy fraud scheme and substantive counts of health care fraud based on the records of specific patients. It further charged that Ifediba, Uchenna, and Ozuligbo laundered the proceeds of the illegal scheme. Uchenna, who had suffered a severe stroke, was dismissed from the case as incompetent. Ebio pled guilty to one count of conspiracy to commit health care fraud and agreed to testify against Ifediba and Ozuligbo.

Before trial, the government filed three motions *in limine* to exclude evidence that Ifediba and Ozuligbo planned to present. Two motions sought to exclude evidence of Ifediba's "good care"—legitimate medical treatment that he had provided to some patients. The third motion sought to exclude Ozuligbo's evidence of Nigerian cultural norms requiring her to obey her older brother.

Over the defendants' opposition, the district court granted the governments' motions, concluding that Ifediba's good-care evidence was improper character evidence in that he sought to establish his innocence by showing that he acted lawfully on some occasions. The court also ruled that Ozuligbo's cultural defense was irrelevant and failed to establish duress.

## B.    The Jury Heard Evidence of Health Care Fraud.

The trial featured testimony from former CCMC patients, undercover law enforcement officers who had posed as patients, CCMC staff, insurance fraud investigators, medical experts, and co-conspirator Ebio.[4] The government also presented patient records to prove health care fraud: allergy questionnaires where the patient indicated no allergy symptoms, allergy tests showing negative results, prescriptions for immunotherapy for patients with negative results, immunotherapy treatment logs for those same patients, and bills to the patients' insurers. These records were the main support for four of the health care fraud counts. The patients whose fraudulent treatment was the subject of those counts did not testify. Instead, Special Agent P.J. Bullock, an FBI investigator, testified about their medical records. Fraud investigators for the

---

[4] Because the appellants raise no challenge to the sufficiency of the evidence supporting their convictions for controlled-substances offenses, we will not discuss the evidence supporting those offenses in detail.

insurers confirmed that the insurers received the allergy claims in question.

Bullock testified about Patient B.B.,[5] who indicated on the clinic's allergy questionnaire that he thought he suffered from allergies. He signed an allergy test consent form, which Ifediba signed as well, and was tested. The test came back negative, but B.B. received a prescription for immunotherapy, signed by Ifediba, anyway. B.B.'s allergy therapy log showed that Ozuligbo gave him an immunotherapy injection. Bullock testified that CCMC billed Medicare $525 for the allergy test and $2,660 for the allergy injection.

Patient D.C.'s records were much the same. They showed that Ifediba signed D.C.'s allergy testing consent form. Her allergy test came back negative. Yet Ifediba prescribed her immunotherapy. Her records show that she received five injections, three of which were administered by Ozuligbo. According to Bullock, CCMC billed Medicare $525 for the allergy test and $2,660 for the allergy injections.

The allergy questionnaire of Patient R.C. indicated that he did not believe he suffered from allergies. Uchenna signed his allergy test consent form, ordered his allergy test, and signed his

---

[5] To protect the patients' privacy, the indictment referred to them by their initials, and we follow its lead. *See United States v. Pon*, 963 F.3d 1207, 1215 n.5 (11th Cir. 2020).

prescription for immunotherapy. Bullock testified that Uchenna and Ifediba together billed R.C.'s private insurer a total of $525 for an allergy test and $2,660 for immunotherapy treatment.

Patient V.T.'s records told a different, but equally disturbing, story. Her insurer received no bill for an allergy test. The investigation revealed no prescription for immunotherapy and no allergy therapy log showing injections. Records documenting a February visit to CCMC lacked any information about V.T. at that visit: no vital signs, assessments, or medical plan. Yet CCMC billed V.T.'s private insurer $2,850 for allergy treatment at this visit. Bullock testified, "They billed the expensive immunotherapy, but [there was] no record of any tests and no billing of actual tests being conducted, just the medication." Doc. 248 at 163.

The government's medical expert, Dr. Jim Christensen, told the jury that it was "[a]bsolutely not" appropriate to test patients for allergies just because their health insurance would pay for the test. Doc. 250 at 94. The defense team's medical expert agreed. Christensen further testified that it was inappropriate to prescribe immunotherapy to someone who had tested negative for allergies: "A board-certified allergist will not prescribe when the tests are negative." *Id.* at 122.

## C.    A Juror Misconduct Issue Arose.

At the close of the government's evidence, both defendants moved for a judgment of acquittal, which the court denied. At that time, the district court learned of an issue with a juror. A

"concerned citizen" had sent an email to the clerk's office informing the court that a juror had been "discussing the case in some detail with people she works with" and, contrary to the court's instructions, had "googled the case." Doc. 252 at 212–13. After discussing the matter with the parties, the court decided that it needed to identify the juror, "talk to her, and see if this is self-contained, if there's been some violation of [the court's] instructions." *Id.* at 214.

The next day, the court determined that the citizen's email was credible because it contained information that could only have come from someone with access to trial evidence. Having followed up with the tipster, the court identified the juror as one of the alternates. The court and the parties discussed different approaches for handling the matter. All agreed that, as an alternate, the juror should be dismissed and that, before dismissing her, the court should question her about whether she had shared any information from her independent research with other jurors. The parties agreed to the court's plan—to dismiss the alternate by telling her that she was no longer needed as an alternate juror and, without mentioning the email, ask her "routine" "due diligence" questions about sharing outside information with other jurors. Doc. 253 at 6, 7. The attorneys would be allowed to request a sidebar during the questioning and pose new questions as desired.

The court, with the parties present, brought in the alternate juror and asked her if she was "aware of any incident of jurors deliberating about the case or doing any investigation beyond the evidence in this case." *Id.* at 12. She said she was not aware of any

such incident. When the court asked the parties if they had any other questions for her, they said no, declining the opportunity for a sidebar.

After dismissing the alternate, the court asked the defendants if they were satisfied. Ifediba's counsel was "satisfied with the questioning" but nevertheless moved for a mistrial. Doc. 253 at 16. He contended that, because the alternate had been dishonest about having independently researched the case, it was "difficult to believe" that she had not shared her research with other jurors. *Id.* He said that "[T]here is a perception that my client cannot get a fair trial at this point." *Id.* The court, noting the lack of "positive evidence" that the alternate had discussed her research with the other jurors, decided that there was no basis for a mistrial on such "scant information" that other jurors had received any extrinsic information or done anything improper. *Id.* at 18, 21. It denied the motion.

Counsel for Ozuligbo suggested that the court "inquire of the present jurors . . . whether or not there ha[d] been any discussions about any sort of outside information," and Ifediba's counsel urged that the court question the jurors "one by one." *Id.* at 21, 26. The court accepted Ozuligbo's counsel's suggestion and declined Ifediba's counsel's, explaining that it was unnecessary to take the "fairly extraordinary" step of individual questioning to address the "metaphysical possibility" that the alternate juror had tainted the other jurors. *Id.* at 30. The court was reluctant to "start a witch hunt" by "call[ing] out jurors one on one and accus[ing] them of"

improperly discussing the case. *Id.* at 33. Individual questioning, the court reasoned, was unlikely to "get[] to the truth." *Id.* at 33, 35. The court decided instead to address the jurors collectively.

The court announced its plan: to instruct the jurors that they must base their verdict only on "the evidence presented in the courtroom and the instructions given by the Court," remind them that the defendants are presumed innocent until all the evidence is in, ask them to stand to affirm that they understand the instruction and will comply, and encourage them to tell the courtroom deputy if they knew of any violation of the instructions. Doc. 253 at 38–39. The court considered self-reporting to the deputy to be more likely to yield results because the deputy "ha[d] a relationship with each one of them." *Id.* at 35. The defendants did not object.

Once the jury returned to the courtroom, the court framed the instructions as a reminder conveniently provided at the mid-point of the trial. It instructed the jury collectively according to the plan laid out to the parties:

> First, I want you to understand that your verdict in this case must be based solely on the evidence presented in the courtroom and the instructions I give you. You are to give a full presumption of innocence to both defendants until you've heard all the evidence. They are presumed innocent until you begin your deliberations finally, after receiving my final instructions. You're not to do any type of research or investigation or any deliberations until you receive all

the evidence and you're all together collectively to do so.

Everyone understand this instruction? Okay. I'm asking you to reconfirm that. I expect that if there's a problem with any juror following this instruction, that one of you with awareness of that will let [the courtroom deputy] know immediately of any violation of this instruction. Everyone understand that? That's each of you have a duty to do that.

If you're willing to follow my instruction in each of these respects, please stand.

*Id.* at 41–42. Each juror stood to signal willingness to follow the instructions. The trial concluded without any report of jurors violating the court's instructions.

## D.    The Court Convicted and Sentenced the Defendants.

At the close of evidence, Ifediba renewed his motion for judgment of acquittal, which the court denied. The court also denied Ozuligbo's renewed motion for judgment of acquittal.

The jury returned guilty verdicts for Ifediba and Ozuligbo. As relevant to this appeal, the jury convicted Ifediba of conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and substantive health care fraud, in violation of 18 U.S.C. § 1347. It also convicted him of conspiracy to distribute or dispense controlled substances outside the course of professional practice, in violation of 21 U.S.C. § 846, and substantive counts of unlawfully distributing or dispensing the controlled substances, in violation of

21 U.S.C. § 841(a)(1), as well as maintaining CCMC for unlawful distribution of controlled substances, in violation of 21 U.S.C. § 856.

The jury convicted Ozuligbo of conspiracy to commit health care fraud and substantive health care fraud. Ifediba and Ozuligbo were also found guilty of money laundering the proceeds of the illegal allergy scheme and conspiring to commit that crime.

The court sentenced Ifediba to 360 months of imprisonment and Ozuligbo to 36 months.

To determine Ifediba's sentence, the presentence investigation report ("PSR") set the base offense level for the controlled substances conspiracy at 36. Following § 2D1.1(c)(2) of the Sentencing Guidelines, the PSR calculated the quantity of illegal substances for which Ifediba was responsible, estimating the converted drug weight to be between 30,000 and 90,000 kilograms. This estimate came from an analysis of Alabama's Prescription Drug Monitoring Program ("PDMP") data spanning the charged conspiracy period from May 2013 to January 2016.[6] Ifediba objected to the PSR's drug quantity calculation.

---

[6] The PDMP is a database that tracks all controlled substances prescribed to a patient in a state. *United States v. Akwuba*, 7 F.4th 1299, 1305 n.2 (11th Cir. 2021). It lists the type of controlled substance, the amount of the substance prescribed, and the name of the doctor who prescribed it. PDMP data is commonly used in pill mill cases like this one. *See, e.g., id.* at 1305, 1309–10.

Only Ifediba challenges the sentence imposed. At his sentencing hearings, held over the course of two days, Ifediba argued that the court should derive the drug quantity using only the prescriptions admitted into evidence at trial that the jury found to be unlawful. The drug quantity for these prescriptions totaled between 1,000 and 3,000 kilograms, which would lead to a base offense level of 30 under the guidelines. Ifediba contended that the court should not extrapolate from the prescriptions evaluated by the jury to assume that all the controlled substances prescribed during the conspiracy period were prescribed unlawfully.

The government presented an expert witness from the DEA, Paul Short, to elaborate on his trial testimony regarding the PDMP records of CCMC patients. His analysis showed that Ifediba and Uchenna had prescribed 1,761 kilograms of converted drug weight to the 21 patients whose prescriptions the jury had found unlawful. Short also looked beyond those patients to the 1,850 patients to whom Ifediba alone had prescribed controlled substances during the two-and-a-half-year-long conspiracy. His analysis revealed that 96% of those patients had been prescribed at least one opioid. The PDMP data also indicated that Ifediba had prescribed the controlled-substances equivalent of 85,264 kilograms of converted drug weight. The government argued that the larger number required a base offense level of 36 under § 2D1.1(c)(2). The court agreed. After applying sentencing enhancements and using Ifediba's criminal history score of I, the district court calculated

Ifediba's guidelines range as 360 months of imprisonment to imprisonment for life. The court sentenced Ifediba to 360 months.

Ifediba and Ozuligbo timely filed this appeal. Ifediba appeals the court's refusal to grant a mistrial and its decision to address the alternate juror's misconduct by instructing the jury collectively instead of questioning them individually. He also challenges the exclusion of his good-care evidence, the sufficiency of the evidence upholding his conviction on four counts of health care fraud, and his sentence. Ozuligbo challenges the exclusion of her cultural-defense evidence and the sufficiency of the evidence supporting her conviction for conspiracy to commit health care fraud.

## II.    STANDARDS OF REVIEW

We generally review a district court's evidentiary rulings for an abuse of discretion. *United States v. Sarras*, 575 F.3d 1191, 1209 n.24 (11th Cir. 2009). Whether the exclusion of the evidence violated a constitutional guarantee is a legal question that we review *de novo. Id.*

We review for an abuse of discretion a court's procedure for investigating juror misconduct. *United States v. Harris*, 908 F.2d 728, 733 (11th Cir. 1990). Similarly, we review the denial of a motion for a mistrial for an abuse of discretion. *United States v. Green*, 981 F.3d 945, 959 (11th Cir. 2020).

"We review *de novo* a challenge to the denial of a Rule 29 motion for a judgment of acquittal based on sufficiency of the evidence grounds." *United States v. Gonzalez*, 834 F.3d 1206, 1214

(11th Cir. 2016). We must review the evidence in the light most favorable to the jury's verdict and draw all inferences in its favor. *Id.*

A district court's determination of drug quantity is reviewed for clear error. *United States v. Reeves*, 742 F.3d 487, 506 (11th Cir. 2014).

## III.    ANALYSIS

We first discuss the district court's evidentiary rulings excluding Ifediba's good care evidence of proper medical treatment and Ozuligbo's cultural-defense evidence that Nigerian cultural norms required her to obey Ifediba as her older brother. Second, we examine the court's choice to address one juror's misconduct by collectively instructing the jury. Third, we review the trial evidence to determine whether it was sufficient to support Ifediba's convictions on four counts of substantive health care fraud and Ozuligbo's conviction for conspiracy to commit health care fraud. Fourth, and finally, we take up Ifediba's challenge to the drug-quantity calculation that the court used to sentence him.

## A.    The Court Properly Excluded Defense Evidence of Good Care and Cultural Norms.

Ifediba and Ozuligbo each challenge the district court's exclusion of certain evidence at trial.

The district court excluded Ifediba's good-care evidence showing that he provided legitimate medical treatment to some patients. The court determined that this was merely an attempt to

portray Ifediba as a person of good character by pointing to his prior good acts. Federal Rule of Evidence 404(a)(1) forbids such use of character evidence, and our precedent holds that "[e]vidence of good conduct is not admissible to negate criminal intent." *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991). The district court did not abuse its discretion when it excluded the good-care evidence as inadmissible character evidence. *See id.*

Ifediba argues that the exclusion violated his constitutional right to present a complete defense to the charge of unlawful distribution of controlled substances. *See United States v. Hurn*, 368 F.3d 1359, 1362–63 (11th Cir. 2004). According to Ifediba, the court should have admitted the good-care evidence because it "tend[ed] to place the story presented by the prosecution in a significantly different light, such that a reasonable jury might receive it differently." *Id.* at 1363. But the government never alleged that Ifediba unlawfully treated every patient who walked through CCMC's doors; indeed, it conceded that his treatment of some patients was legitimate. Thus, it was no defense that Ifediba lawfully treated some patients. The district court did not abuse its discretion by excluding such evidence as improper character evidence, and the exclusion did not violate Ifediba's constitutional right to present a defense.

Ozuligbo challenges the district court's exclusion of evidence supporting a defense to voluntary participation in the conspiracy based on the Nigerian cultural norms requiring her to be "subservient" to her older brother. Doc. 86 at 3. The district court

did not abuse its discretion in excluding this evidence from trial. We have rejected a similar argument before. *See United States v. Almanzar*, 634 F.3d 1214, 1223 (11th Cir. 2011). In *Almanzar*, a district court set aside the jury's guilty verdict because "cultural expectations" required the defendant to obey her male family members. *Id.* at 1221. Seeing error in the court's reliance on stereotypes, among other things, we vacated the judgment of acquittal and directed the court to reinstate the jury's verdict. *Id.* at 1223–24. Ozuligbo's argument here is no different, and we reject it.

**B.    The Court Acted Within Its Discretion in Addressing Juror Misconduct by Instructing the Jury Collectively.**

When an allegation of juror misconduct arises, the court must determine whether the misconduct occurred and whether it was prejudicial. *Harris*, 908 F.2d at 733. But there is no bright-line rule requiring a district court "to investigate the internal workings of the jury whenever a defendant asserts juror misconduct." *United States v. Cuthel*, 903 F.2d 1381, 1382–83 (11th Cir. 1990). A district court has "broad discretion in deciding whether to interrogate jurors regarding alleged misconduct." *United States v. Barshov*, 733 F.2d 842, 850 (11th Cir. 1984). "[T]he investigative procedure to be used in checking for juror misconduct falls within the discretion of the district court." *United States v. Caldwell*, 776 F.2d 989, 997 (11th Cir. 1985). A court abuses its discretion and commits reversible error when it fails to investigate as thoroughly as the situation requires and the insufficient investigation prejudices the defendant. *See id.* at 1000; *Harris*, 908 F.2d at 733.

We evaluate the court's chosen investigative procedure based on where the juror misconduct falls along a "continuum focusing on two factors." *Caldwell*, 776 F.2d at 998. "At one end of the spectrum the cases focus on the certainty that some impropriety has occurred." *Id.* "The more speculative or unsubstantiated the allegation of misconduct, the less the burden to investigate." *Id.* "At the other end of the continuum lies the seriousness of the accusation." *Id.* "The more serious the potential jury contamination, especially where alleged extrinsic influence is involved, the heavier the burden to investigate." *Id.* When a party makes a "colorable showing of extrinsic influence," the court must investigate to determine whether the influence was prejudicial. *Barshov*, 733 F.2d at 851. But "[t]he duty to investigate arises only when the party alleging misconduct makes an adequate showing of extrinsic influence to overcome the presumption of jury impartiality." *Id.*

At the more speculative end of the spectrum lies *Barshov*, a case in which a juror's son had spent time talking to the jurors during recesses and eating lunch with them. *Id.* The son had also spoken to defense counsel, the defendant's wife, and the prosecutor about the case. *Id.* After the jury returned a guilty verdict, defense counsel asked the court to interview each juror individually because of defense counsel's "suspicion" that the son had improperly influenced the jury with "extraneous, prejudicial information." *Id.* (internal quotation marks omitted). But counsel failed to support that suspicion with any evidence indicating "the improper conveyance of information to the jury." *Id.* at 852 (internal quotation

marks omitted). The district court denied the motion, and we affirmed. *Id.* at 851. Because the defense failed to show—beyond speculation—that the son had "improper discussions" with the jurors or that his conduct "impugned in any way the integrity of the trial process," we held that the district court acted within its discretion in declining to interview each juror individually. *Id.* at 852.

At the other end of the spectrum, reflecting substantiated and serious outside influence, is an outside party's attempt to influence a juror, as seen in *United States v. Forrest*, 620 F.2d 446, 456–57 (5th Cir. 1980).[7] There, a husband and wife were convicted of federal crimes related to receiving stolen property. *Id.* at 449. A juror's niece, a friend of one of the defendants, tried to persuade the juror to vote for acquittal. *Id.* at 456. The court excused the juror but allowed the trial to continue, and it ended with both defendants being convicted. *Id.* at 449, 457. On appeal, the husband argued that as a result of the outside influence, he did not receive a trial by a fair and impartial jury. *Id.* at 456. Noting that "[a]ny off-the-record contact with a jury is presumptively prejudicial," we determined that the government had failed to carry its burden of proving that "such a contact did not affect the jury." *Id.* at 457. Although the dismissed juror reported that the other jurors had no knowledge of the contact, her testimony was "insufficient" due to the seriousness

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding all Fifth Circuit precedent handed down prior to October 1, 1981.

of the misconduct as "[c]ontacts such as those that may have occurred in this case raise serious questions of prejudice." *Id.* at 457–58. We observed that "[o]nly the other jurors [could] enlighten us" as to whether the dismissed juror had spoken to them about the case. *Id.* at 457. We remanded the case so the court could question the jurors individually to determine whether the dismissed juror had discussed the case with them and shared "extraneous prejudicial material." *Id.* at 458.

Somewhere in the middle of spectrum, illustrating a somewhat substantiated and relatively serious allegation, sits *United States v. Brantley*, 733 F.2d 1429 (11th Cir. 1984). In *Brantley*, after the jury returned guilty verdicts, one juror (Miller) told the court that, during deliberations, another juror (Blige) had "brought into the jury room the extrinsic fact that [a defendant] had been involved with drug smuggling before." *Id.* at 1439. At a hearing, Blige denied making the remark, and the court prevented defense counsel from questioning Miller or the other jurors. *Id.* Observing that Miller's "personal knowledge" lent credibility to her allegation, we held that the court's refusal to investigate it further was an abuse of discretion and remanded the case so the court could uncover whether the incident occurred and, if it did, whether there was a reasonable possibility of prejudice to the defendant. *Id.* at 1440–41.

Here, the court received a credible tip that the alternate juror had "googled the case" and discussed it with her coworkers. Doc. 252 at 212–13. When the court asked her if she was aware of any jurors independently researching the case or discussing it, she

said no. The court dismissed the alternate. Even though the court had questioned the alternate according to the plan agreed upon by the parties, Ifediba moved for a mistrial, arguing that the alternate might have discussed her research with the other jurors. Though the tip did not say that the alternate had shared information with other jurors, Ifediba urged the court to ask each juror individually about participation in any discussions of outside information. Refusing to embark on a "witch hunt," the court instead chose to address the jurors collectively, reminding them of the court's instructions and asking them to report any improper discussions to the courtroom deputy. Doc. 253 at 33.

This incident falls at the less serious end of the spectrum of juror misconduct. To be sure, the alternate ignored the court's instructions to refrain from researching the case online or elsewhere. The tip that she had done so was substantiated given that the tipster knew details that could only have come from the trial. And outside research by a juror is prohibited because "[t]he sixth amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial." *United States v. Perkins*, 748 F.2d 1519, 1533 (11th Cir. 1984). The court appropriately dealt with the substantiated instance of misconduct by dismissing the alternate, thereby preventing her from playing any role in the verdict. Significantly, Ifediba's counsel agreed to the court's proposed method of questioning the alternate and declined the opportunity to request a sidebar during her questioning or ask further questions.

Ifediba's charge of further misconduct, however, was purely speculative. There was no evidence that the tainted alternate had improper discussions with the rest of the panel. Ifediba's suspicion arose because, in response to the court's questioning, the alternate denied that she had violated the court's instructions. Her lack of candor caused Ifediba to posit that she had committed more serious misconduct by sharing outside information with the other jurors. Unlike the alleged improper discussions in *Brantley*, Ifediba's allegation was based not on personal knowledge, but on the "metaphysical possibility that [the alternate] may have discussed something" with other jurors. Doc. 253 at 25; *Brantley*, 733 F.2d at 1439. Because he presented no evidence to support his suspicion, it remained "mere speculation" and nothing more. *Barshov*, 733 F.2d at 851. Thus, just like in *Barshov*, the trial court had discretion to refrain from taking the extraordinary step of individually questioning the jurors to address the allegation of misconduct.

Even so, the court took the additional step of instructing the remaining jurors collectively and obtaining their agreement to follow the court's instructions and report any violation of the instructions. *See Harris*, 908 F.2d at 734 ("The district court cured any possible taint by questioning the jurors on their ability to remain impartial and giving them an admonition to keep an open mind."). Given its speculative nature, the allegation of improper jury discussions did not require a more intensive investigation than the district court performed.

But even if the court should have questioned the jurors individually, Ifediba failed to show any prejudice to his defense or lack of integrity in the trial process.[8] *See Harris*, 908 F.2d at 733; *Barshov*, 733 F.2d at 852 ("In the absence of a colorable showing that the conduct complained of impugned in any way the integrity of the trial process, the district court was not required to make further inquiries or to conduct a hearing, and its refusal to do so did not constitute an abuse of discretion.").

Before concluding our discussion of this issue, we note our agreement with the district court that individual questioning of the jury is not to be undertaken lightly. It has the potential to "aggravate the situation" by drawing attention to misconduct. *Barshov*, 733 F.2d at 850 (internal quotation marks omitted). The district court in *United States v. Caldwell* declined to question a juror who had spoken with another juror accused of misconduct. *Caldwell*, 776 F.2d at 995. We found no abuse of discretion, recognizing the court's concern that "direct inquiry of any of the jurors by counsel might itself contaminate the jury panel." *Id.* The district court here

---

[8] In his brief, Ifediba failed to support with arguments and citations to authority his challenge to the district court's denial of a mistrial. Thus, we deem this issue abandoned. *See Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 681 (11th Cir. 2014). Were we to reach the merits, though, we would affirm the district court. "A defendant must show substantial prejudice to be granted a mistrial." *United States v. Barsoum*, 763 F.3d 1321, 1340 (11th Cir. 2014). Ifediba has failed to show any prejudice; therefore, we find no abuse of discretion in the district court's denial of his mistrial motion.

shared that concern, warning counsel that "if we start questioning each juror one on one, they will believe we're accusing them." Doc. 253 at 33. Rather than risk "unintended consequences," the court made the reasoned decision to investigate the speculative allegation by addressing the jurors collectively and encouraging them to self-report any improper discussions to the courtroom deputy.[9] *Id.*; *see Harris*, 908 F.2d at 734 ("[T]he district court's limited hearing on the matter was appropriate because additional investigation might have over-emphasized the remark.").

To sum up, we see no abuse of discretion in the district court's handling of the juror misconduct. After all, "[t]he whole point of discretion is that there is [a] range of options open, which means more than one choice is permissible." *United States v. Dominguez*, 226 F.3d 1235, 1247 (11th Cir. 2000). And we recognize that the district court has the "superior vantage point" from which to evaluate juror misconduct. *Caldwell*, 776. F.2d at 999. "The district court is in the best position to make the necessary determinations. Having clothed the court with broad discretion, we will not now attempt to second-guess the evaluation and ultimate

---

[9] The court had good reason to believe that the jurors would inform the courtroom deputy of any violations of the court's instructions. Earlier in the trial, individual jurors had approached the deputy and self-reported concerns about potential impropriety: a juror who worked at the post office had met someone named "Ebio" at work, another juror recognized a witness from church, and a third juror realized that CCMC was located across the street from a family member's office.

holding." *Barshov*, 733 F.2d at 851. We see no abuse of discretion here.

## C.    Sufficient Evidence Supported Ifediba and Ozuligbo's Convictions.

Sufficiency-of-the-evidence review requires us to examine "whether the evidence, when viewed in the light most favorable to the government, and accepting reasonable inferences and credibility choices by the fact-finder, would enable the trier of fact to find the defendant guilty beyond a reasonable doubt." *United States v. Monroe*, 866 F.2d 1357, 1365 (11th Cir. 1989). We will affirm a conviction unless there is "no reasonable construction of the evidence" from which the jury could have found the defendant guilty beyond a reasonable doubt. *United States v. Garcia*, 405 F.3d 1260, 1269 (11th Cir. 2005).

### 1. Patient Records Were Sufficient to Support Ifediba's Convictions for Substantive Health Care Fraud.

The jury convicted Ifediba of 10 counts of substantive health care fraud, in violation of 18 U.S.C. § 1347(a). The statute provides:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—
> (1)    to defraud any health care benefit program; or
> (2)    to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

> in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

18 U.S.C. § 1347(a). Thus, to be convicted "in a health care fraud case, the defendant must be shown to have known that the claims submitted were, in fact, false." *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007). "A person makes a false claim if the treatments that were billed were not medically necessary or were not delivered to the patients." *United States v. Chalker*, 966 F.3d 1177, 1188 (11th Cir. 2020) (internal quotation marks omitted).

Ifediba challenges the sufficiency of the evidence supporting 4 of his 10 convictions for health care fraud. Each conviction arose from his or co-conspirator Uchenna's treatment of a particular patient, six of whom testified at trial. Ifediba challenges the convictions stemming from the treatment of the four patients who did not testify. He argues, without citation to authority, that documentary evidence alone was insufficient to establish health care fraud and that the government needed to present patient testimony to prove its case. But we reject his argument because documentary evidence and testimony from other witnesses sufficiently established that he knowingly made false representations to health care benefits providers to obtain money from health care benefit programs.

For each of the counts Ifediba challenges, patient files and billing records demonstrated that he or his co-conspirator,

Uchenna, ordered treatment knowing that it was medically unnecessary. The jury heard that Ifediba ordered allergy tests for Patient B.B. and Patient D.C. According to their patient files, both patients tested negative for allergies, yet Ifediba prescribed them immunotherapy anyway. Patient R.C.'s allergy test was ordered by Uchenna, who prescribed immunotherapy despite a negative test result.[10] Patient V.T. received neither an allergy test nor an immunotherapy prescription, but her insurer received a bill for immunotherapy treatment from CCMC. These patients did not have allergies. Ifediba knew they did not have allergies because the tests that CCMC performed came back negative. Although the patients did not need what he prescribed, he nevertheless made fraudulent representations to the insurers that the patients needed allergy treatment. It is true that none of the four patients testified to that effect, but other witnesses did.

Testimonial evidence confirmed that Ifediba likely knew the treatment was unnecessary but billed insurers for it anyway. The

---

[10] Though Uchenna, not Ifediba, ordered the test and prescribed the medication for Patient R.C., the false claim provides support for Ifediba's conviction nonetheless. Ifediba does not challenge his conviction for conspiracy to commit health care fraud, and, as a co-conspirator, he is liable for the reasonably foreseeable crimes that his co-conspirators committed in furtherance of the conspiracy. *Chalker*, 966 F.3d at 1189 (citing *Pinkerton v. United States*, 328 U.S. 640 (1946)). The fact that CCMC, through Ifediba himself or his wife, "would submit fraudulent claims as a consequence and in furtherance of this conspiracy is virtually the definition of 'reasonably foreseeable.'" *Id.* at 1189–90 (internal quotation marks and emphasis omitted).

government's medical expert, Dr. Jim Christensen, testified that it was "inappropriate" to prescribe immunotherapy to someone who tested negative for allergies. Doc. 250 at 99. This suggests that Ifediba knew that the allergy treatment was medically unnecessary, and the claims he submitted thus were false. Special Agent Bullock testified that Ifediba billed insurers $525 for an allergy test and $2,660 or $2,850 for immunotherapy. The testimony of fraud investigators for the insurers confirmed that CCMC submitted allergy-related claims for these patients. Further testimony showed that Ifediba personally signed all the bills charging Medicare and private insurers for the medically unnecessary treatment, thereby defrauding them through false claims.

The paper trail and testimony illustrating Ifediba's fraudulent representations are enough for a jury; live testimony from patients, while helpful, is not required. "[A] defendant's knowledge can be proven in more than one way." *United States v. Clay*, 832 F.3d 1259, 1311 (11th Cir. 2016). Nothing in our precedent requires that patients testify regarding the defendant's fraudulent representations to insurers to support a health care fraud conviction. *See generally id.* at 1294–1304, 1311 (upholding convictions for health care fraud based on Medicaid expense reports unsupported by patient testimony). And in this case, there was also testimony—not from patients but from Christensen, Bullock, and the insurers—supporting the healthcare fraud convictions. Evaluating the evidence, a reasonable jury could conclude that Ifediba committed health care fraud by knowingly prescribing medically

unnecessary treatment and submitting false information to receive payment from healthcare benefit programs. We thus affirm the jury's verdict on the four counts of health care fraud.

> 2. Sufficient Evidence Supported Ozuligbo's Conviction for Conspiracy to Commit Health Care Fraud.

To sustain a conviction for conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, the government must establish beyond a reasonable doubt that: "(1) a conspiracy existed to commit health care fraud under 18 U.S.C. § 1347; (2) [the defendant] knew of the conspiracy; and (3) [the defendant] knowingly and voluntarily joined it." *Gonzalez*, 834 F.3d at 1214. Because the crime of conspiracy is "predominantly mental in composition," the government may prove these elements by circumstantial evidence and inferences therefrom. *United States v. Moran*, 778 F.3d 942, 960 (11th Cir. 2015) (internal quotation marks omitted). The government need not prove that the defendant knew all the details of the conspiracy; it need only prove "that the defendant knew of the essential nature of the conspiracy." *Gonzalez*, 834 F.3d at 1215 (internal quotation marks omitted). "[A] conspiracy conviction will be upheld when the circumstances surrounding a person's presence at the scene of conspiratorial activity are so obvious that knowledge of its character can fairly be attributed to her." *United States v. Mateos*, 623 F.3d 1350, 1362 (11th Cir. 2010) (alterations adopted) (internal quotation marks omitted). "The Government can establish that a defendant voluntarily joined the conspiracy through proof of surrounding circumstances such as acts

committed by the defendant which furthered the purpose of the conspiracy." *Gonzalez*, 834 F.3d at 1215 (internal quotation marks omitted).

There was more than sufficient evidence to demonstrate that CCMC defrauded insurers through an allergy fraud scheme. The only question is whether Ozuligbo was a knowing and voluntary participant in the conspiracy. Ozuligbo argues that the government established neither her knowledge of the conspiracy nor her voluntary participation in it. Rather than a co-conspirator, she asserts that she was "merely an employee." Ozuligbo's Brief at 20. The evidence showed otherwise.

To begin with, patient medical records illustrated that Ozuligbo knew of the conspiracy to provide immunotherapy treatment to patients who had tested negative for allergies. She gave patients allergy tests, signing her name to the test records. She recorded the negative results but also recorded that she administered immunotherapy to them. Her initials were on Patient D.C.'s allergy log listing the three injections she purportedly gave this patient who tested negative for allergies. Patient B.B.'s allergy log also showed a negative test followed by immunotherapy treatment. For another patient—who had also tested negative for allergies—she noted that the patient said the immunotherapy was alleviating her symptoms. But the patient testified that she never had allergies, never received an injection, and never said that the injections were helping her.

These medical records further show that Ozuligbo partici-pated in the conspiracy by filing paperwork for treatments that were medically unnecessary and treatments that were not deliv-ered to the patients. *See Chalker*, 966 F.3d at 1188. The evidence that Ozuligbo filled out fraudulent paperwork supports the infer-ence that Ozuligbo "played a daily and active role in furthering the unlawful objectives" of the conspiracy. *Gonzalez*, 834 F.3d at 1217 (upholding the conviction of a defendant who filled out fraudulent logs indicating that she gave patients medically unnecessary treat-ment).

Then, too, Ozuligbo was hired under unusual circum-stances, suggesting that she was a knowing participant in the con-spiracy. Ifediba pressured Ebio to hire her as an ASNA allergy tech-nician even though ASNA already had enough technicians. And Ozuligbo knew that ASNA was paying her "double the money that [the] other technicians were making." Doc. 251 at 175. The jury could infer that Ozuligbo understood her special treatment to be part of a larger scheme that gave her brother the leverage to insist on her employment and benefits.

Ozuligbo knew that the larger scheme included CCMC's practice of testing every insured patient, and her participation in the practice shows that she knew about and participated in the con-spiracy to commit health care fraud. Christensen, the govern-ment's medical expert, told the jury that it was neither medically necessary nor appropriate to test patients for allergies based solely on the fact that their health insurance would cover it. But this is

precisely what CCMC did. It had a "blanket practice" of performing allergy tests on all insured patients after first confirming coverage with their insurers. Doc. 247 at 195. It did not test cash-paying patients for allergies. In addition to testing the patients, Ozuligbo was responsible for calling their insurers and confirming coverage of allergy-related claims. Although confirming insurance coverage, standing alone, could be innocent behavior, the fact "[t]hat a purported medical care clinic" performed allergy tests on every insured patient who walked through its door "is, to put it charitably, a most unusual arrangement." *Gonzalez*, 834 F.3d at 1215.

And when patients or fellow technicians objected to the unusual arrangement, Ozuligbo furthered the conspiracy by convincing them to go along with it despite their misgivings. Ebio testified that "there were some patients that did not want to get tested, but when they were referred back to either Dr. Ifediba or his sister, Justina [Ozuligbo], the patient would then accept the testing." Doc. 251 at 96. A fellow technician, noticing that patients were being pressured into taking the allergy tests, voiced her concerns about the practice to Ozuligbo. Listen to Ifediba, Ozuligbo told the technician, "You just need to do what you got to do." Doc. 250 at 151. The jury could reasonably conclude from this evidence that Ozuligbo persuaded patients and technicians to acquiesce to the medically unnecessary allergy testing because she knew about the conspiracy and voluntarily participated in it.

But the evidence does not end there. Ozuligbo's conversation with Special Agent Bullock supports an inference that she

knew about the nature of the conspiracy and participated in it. Bullock arranged to meet Ozuligbo at her house for an interview. Standing in her driveway, Ozuligbo told Bullock that she performed allergy tests and provided immunotherapy at CCMC when she used to work there. She told him that CCMC "only did allergy testing and immunotherapy for patients with insurance" because "it was expensive and cash-paying patients wouldn't pay for it." Doc. 247 at 49. Bullock showed her some positive allergy tests that she had performed, and Ozuligbo confirmed her handwriting on the tests. Unprompted, she told Bullock that, if the tests were negative, the patients would not get immunotherapy. Bullock showed her a negative test, which Ozuligbo confirmed she had administered and marked as negative. He then showed her that same patient's therapy log indicating that Ozuligbo had given the patient four injections of allergy medication. She said that she probably needed an attorney. On the verge of tears, she told him, "I left there to get away from that craziness and all the crazy patients, and now I work for peanuts." *Id.* at 58.

From this evidence, the jury readily could have found that Ozuligbo knowingly participated in a conspiracy to bill for medical services that were not actually medically necessary or delivered to the patients. The entire exchange supports an inference that Ozuligbo knew she had participated in a conspiracy. She told Bullock that CCMC did not order immunotherapy for patients who tested negative for allergies but, when confronted with evidence that she had done just that, backed away. The jury, looking at Ozuligbo's

conduct and the circumstances at CCMC, could conclude that she knew about and participated in the conspiracy to commit health care fraud. Having examined the evidence that supports her conspiracy conviction and found it to be sufficient, we reject her challenge and affirm her conviction.

### D.    Ifediba's Sentence Was Procedurally Reasonable.

When we review for clear error the district court's determination of the drug quantity, we will leave the finding in place unless it leaves us with a "definite and firm conviction that a mistake has been committed." *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010) (internal quotation marks omitted). The government bears the burden of establishing drug quantity by a preponderance of evidence. *United States v. Rodriguez*, 398 F.3d 1291, 1296 (11th Cir. 2005).

Drug distribution in the medical context requires proof that the prescription was not for a legitimate medical purpose or that the prescription was not made in the usual course of professional practice. *See United States v. Joseph*, 709 F.3d 1082, 1102 (11th Cir. 2013). When there is no drug seizure that readily demonstrates the scale of the offense, the district court must approximate the drug quantity based on "fair, accurate, and conservative estimates" of the quantity. *United States v. Zapata*, 139 F.3d 1355, 1359 (11th Cir. 1998); U.S. Sent'g Guidelines Manual § 2D1.1 cmt. n.5 (U.S. Sent'g Comm'n 2018). That estimate cannot be speculative; it must be in line with the average frequency and amount of a defendant's drug

sales over a given period. *United States v. Frazier*, 89 F.3d 1501, 1506 (11th Cir. 1996).

Ifediba challenges the procedural reasonableness of his sentence for conspiracy to distribute controlled substances, arguing that the district court erred in attributing 85,264 kilograms of converted drug weight to him.[11] He argues that the court's estimate of the quantity was wrong because "[d]rug distribution in cases involving physicians [is] totally different." Ifediba's Brief at 27. In such cases, he contends, the court should not extrapolate from the "cherry-picked" prescriptions found unlawful at trial but should instead determine whether each prescription written by the defendant was unlawful or legitimate. Doc. 242 at 32. We disagree.

The court based its drug quantity finding on "reliable and specific evidence"—analysis of the PDMP data of the Schedule II controlled substances Ifediba prescribed during the conspiracy

---

[11] A procedurally sound sentence is substantively unreasonable if it is not justified by the totality of the circumstances and the sentencing factors set out in 18 U.S.C. § 3553(a). *Gall v. United States*, 552 U.S. 38, 51 (2007). The factors require the sentencing court to consider, among other things, the nature and circumstances of the offense, the history and characteristics of the defendant, the kinds of sentences available, the applicable guidelines range, the pertinent policy statements of the Sentencing Commission, the need to avoid unwarranted sentence disparities among similar defendants, and the need to provide restitution to victims. 18 U.S.C. § 3553(a)(1), (3)–(7). *United States v. Trailer*, 827 F.3d 933, 936 n.2 (11th Cir. 2016). Because Ifediba failed to challenge the substantive reasonableness of his sentence, however, we consider that challenge abandoned. *See Sapuppo*, 739 F.3d. at 680.

period. *United States v. Cobb*, 842 F.3d 1213, 1219 (11th Cir. 2016). The court acknowledged the possibility that some of those prescriptions could have been written for a legitimate medical purpose but concluded that the broader pill mill conspiracy to distribute controlled substances supported an inference that most of the prescriptions were unlawful. The court noted the trial evidence illustrating that CCMC supplied controlled substances to people who had no medical need for them: "[W]e had evidence from witnesses who basically said the word on the street was that if you lost your dealer, you could go to this clinic and get what you were looking for on the streets." Doc. 242 at 42. Evidence also demonstrated that Uchenna wrote her share of "bad prescriptions," CCMC provided an "exponentially higher amount of prescriptions" than other clinics of its size, and the clinic likely engaged in unlawful drug distribution before and after the conspiracy period. Doc. 331 at 12, 19.

Similarly, in *United States v. Azmat*, 805 F.3d 1018, 1047 (11th Cir. 2015), we found no error in a drug-quantity estimate based on all the prescriptions written by the defendant doctor. The government did not have to prove that each prescription was unlawful because "[t]he trial evidence showed that [the clinic] was a pill mill that did not serve a legitimate medical purpose. . . . Abundant evidence showed that [the defendant] was aware of its illegitimacy." *Id.* Here, Ifediba ran CCMC as a pill mill and was aware of its illegitimacy. The district court did not clearly err in attributing to him a drug quantity based on specific data from the controlled substances he prescribed. We affirm his sentence.

42                    Opinion of the Court                    20-13218

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court on all grounds.

**AFFIRMED.**